ST. LUKE'S HOSPITAL, Respondent,

v.

MIDWEST MECHANICAL CONTRACTORS, INC., Appellant.

No. WD 34990.

Missouri Court of Appeals, Western District.

Nov. 20, 1984.

Richard W. Miller, William J. DeBauche and Stephen R. Miller, of Miller & Glynn, P.C., Kansas City, for appellant.

Allan V. Hallquist of Blackwell, Sanders, Matheny, Weary & Lombardi, Kansas City, for respondent.

Before TURNAGE, C.J., and SHAN-GLER and MANFORD, JJ.

MANFORD, Judge.

This is an appeal from a circuit court judgment in the form of an order of a temporary stay of arbitration pursuant to § 435.355, RSMo 1978. The judgment is affirmed.

While formally three points are presented, in reality they are but variations of a single alleged error, to wit, the trial court incorrectly interpreted a specific provision within a construction contract. The three variations are considered within the disposition of the appeal.

In summary, the applicable facts are as follows.

On December 7, 1982, respondent, St. Luke's Hospital (hereinafter St. Luke's), issued invitations to bid on a contract for the construction of a flue gas heat recovery system. The project was in part to be funded by the federal government. St. Luke's had requested the right to negotiate the selection of the project contractor, but the Department of Energy, as the approving federal agency, required that St. Luke's submit the mechanical work for competitive bidding. St. Luke's extended the bid invitation to five Kansas City area mechanical contractors. Appellant, Midwest Mechanical Contractors, Inc. (hereinafter Midwest), was one of the bidding contractors.

Midwest submitted the lowest bid in the sum of $116,800.00. St. Luke's awarded the contract to the second lowest bidder, with a bid of $119,000.00, the A.D. Jacobson Co., Inc. There was a "formal bid opening" at which time no formal rejection of the Midwest bid was entered.

The evidence reveals that the bidding contractors were required to complete their bid proposal form which contained information for the bidders relative to the project specifications. Included with the specifications was a two-page form captioned, "Bidder's Statement of Qualifications." Each bidder was required to submit proof of its experience, qualifications, financial responsibility, and ability to complete the project. The specifications, when read, establish that St. Luke's was soliciting bids, and within sub-section 4(g), St. Luke's, as owner, reserved the right to waive any informalities in the proposals and also to reject any and all of the proposals. It was established that the Vice-President of Midwest had read and was familiar with the forego-

ing reservations. In addition, within each proposals form was a "bidder's acknowledgment" that the bidder understood St. Luke's reserved the right to waive informalities and to reject any and all bids.

When read, the invitation does not state directly, nor is there any implication, that the lowest bidder was guaranteed the award of the contract. Section 8(b) of the invitation informed all bidders of the criteria that St. Luke's, as owner, would consider in the awarding the contract. That section reads:

In awarding the contract, Owner [St. Luke's] may take into consideration the ability to promptly handle the additional work, skill, facilities, capacity, experience, ability, responsibility, previous work and financial standing of bidder; quality, efficiency and construction of equipment proposed to be furnished; period of time within which equipment is proposed to be furnished and delivered; and necessity of prompt and efficient completion of work herein described. Inability of any bidder to meet the requirements mentioned above may be cause for rejection of his proposal.

St. Luke's entered into a contract with the A.D. Jacobson Co., Inc. and at no time did St. Luke's and Midwest enter into any agreement.

In addition to the above specific terms, the written specifications contained a part captioned, "General Conditions." This part specified the mutual obligations as between the "owner" [St. Luke's] and the "contractor" [i.e., the contractor selected by St. Luke's]. The terms "owner" and "contractor" are defined within this part. St. Luke's is defined as "owner". "Contractor" is defined as, "[t]he person, firm or corporation *with whom Owner has entered into an agreement.*" In addition, the term *"agreement" is defined as "[t]he written agreement between Owner and Contractor covering the work to be performed;* other Contract Documents are attached to the agreement and made part thereof as provided therein."

In addition to the foregoing, there is found with the "General Conditions" Article 13, which reads as follows:

ARTICLE 13

*Arbitration*

All claims, disputes and other matters in question between OWNER and CONTRACTOR arising out of, or relating to the Contract Documents or the breach thereof, shall be decided by arbitration in accordance with the Construction Industry Arbitration Rules of the American Arbitration Association then obtaining subject to the limitations of this Article 13. This agreement so to arbitrate and any other agreement or consent to arbitrate entered into in accordance herewith as provided in this Article 13 will be specifically enforceable under the prevailing arbitration law of any court having jurisdiction.

Subsequent to the award of the contract to Jacobson, Midwest filed its demand for arbitration. This demand was premised upon Midwest's alleged rights under the above Article 13. It was and continues to be the position of Midwest that St. Luke's should have awarded the contract to Midwest since Midwest submitted the lowest bid. In response, St. Luke's filed an "Application to Stay Threatened Arbitration Proceedings" in the circuit court within and pursuant to § 435.355, RSMo 1978. A hearing was conducted and both St. Luke's and Midwest submitted evidence. The circuit court then entered its order staying the pending arbitration proceedings.[1] The circuit court, in entering its order, declared that upon the evidence submitted there was found no agreement to arbitrate between St. Luke's and Midwest. This appeal followed the entry of the stay order.

As noted above, the main assertion of Midwest is that the circuit court erred in its interpretation of the above *Article 13* of the "General Conditions" of the contract. Within this broad assertion, Midwest includes three specific contentions, which are summarized and disposed of as follows:

(1) The evidence revealed that St. Luke's did not have a substantial and bona fide objection to the agreement to arbitrate in that Article 13 expressly provides that "all claims and disputes and other matters in question between owner and contractor arising out of or relating to the contract documents or the breach thereof shall be decided by arbitration;" the proposal forwarded to the bidders expressly stated on its face that this portion of the bidding documents was part of the contract documents and any bidding disputes that were covered by the contract documents in that they arose out of and related to the contract documents, and the court erred because even if there existed two alternative interpretations of Article 13, one permitting and another preventing arbitration, the trial court could not positively declare that the parties intended to exclude the dispute from arbitration since the trial court merely found that no agreement existed and in so finding the trial court "failed to consider the existence of a colorable dispute of an arbitriable nature which requires arbitration."

In support of the foregoing contention, Midwest cites to § 435.355, *American Federation of Television and Radio Artists, AFL–CIO v. Taft Broadcasting Co., Station WDAF*, 368 F.Supp. 123 (W.D.Mo. 1973), *Greater Kansas City Laborers District Council v. Builders Association*, 213 F.Supp. 429 (W.D.Mo.1963), and *National Railroad Passenger Corp. v. Missouri Pacific Railroad Co.*, 501 F.2d 423 (8th Cir. 1974).

Section 435.355 reads:

435.355. Proceedings to compel or stay arbitration

1. On application of a party showing an agreement described in section 435.-350, and the opposing party's refusal to arbitrate, the court shall order the parties to proceed with arbitration, but if the opposing party denies the existence of the agreement to arbitrate, the court shall proceed summarily to the determination of the issue so raised and shall

1. The arbitration proceedings pend before the American Arbitration Association.

order arbitration if found for the moving party; otherwise, the application shall be denied.

2. On application, the court may stay an arbitration proceeding commenced or threatened on a showing that there is no agreement to arbitrate. Such an issue, when in substantial and bona fide dispute, shall be forthwith and summarily tried and the stay ordered if found for the moving party. If found for the opposing party, the court shall order the parties to proceed to arbitration.

3. If an issue referable to arbitration under the alleged agreement is involved in action or proceeding pending in a court having jurisdiction to hear applications under subsection 1 of this section, the application shall be made therein. Otherwise and subject to section 435.435, the application may be made in any court of competent jurisdiction.

4. Any action or proceeding involving an issue subject to arbitration shall be stayed if an order for arbitration or an application therefor has been made under this section or, if the issue is severable, the stay may be with respect thereto only. When the application is made in such action or proceeding, the order for arbitration shall include such stay.

5. An order for arbitration shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim sought to be arbitrated have not been shown.

◼ The reliance of Midwest upon 435.-355 is misplaced. That section provides a statutory scheme for compelling or staying arbitration proceedings. However, the application of that statutory section is premised upon the pre-existence of an agreement between the parties as described within § 435.350, RSMo 1978. Section 435.350 reads:

435.350. Validity of arbitration agreement

A written agreement to submit any existing controversy to arbitration or a provision in a written contract, except contracts of insurance and contracts of adhesion, to submit to arbitration any controversy thereafter arising between the parties is valid, enforceable and irrevocable, save upon such grounds as exist at law or in equity for the revocation of any contract; provided, however, that contracts which warrant new homes against defects in construction shall not be construed to be 'contracts of insurance or contracts of adhesion' for purposes of this section.

◼ Under the particular facts and circumstances of the instant case, it is clear that Midwest and St. Luke's never entered into any written agreement as intended within § 435.350. The most obvious evidentiary support for the finding that Midwest and St. Luke's never entered into any agreement, in addition to Midwest's not being awarded the contract, comes from the contract document itself which defines "contractor" as noted above. Midwest never acquired status or standing as a "contractor" within the term and meaning of the contract. Hence, it must follow that § 435.355 is not applicable in support of Midwest's claim for arbitration.

By its very wording, *Article 13* uses the term "owner" and "contractor", and those terms are defined within the contract. From the whole of the contract and all documents relative thereto, including the bid proposals, it is quite obvious that the intent of Article 13 is an agreement to arbitrate disputes between the "owner" and the "contractor", the latter being that party to whom the contract was awarded.

◼ This court's attention is directed to the fact that heretofore, § 435.355.2 has not been judicially interpreted and research discloses it has not.[2] That section is quite clear in its wording and hence its intent. It is the legislative authority to a court of

2. However, concerning information on this section, see 46 Mo.L.Rev. 627, 630 (1981) and 30

Journal Mo.Bar 258 (1982).

proper jurisdiction to entertain an application of one or more parties to stay a threatened or commenced arbitration proceeding. The application, of course, must be premised upon an allegation that there exists no agreement between the parties to arbitrate. In addition, this statutory section permits the court to resolve a substantial or bona fide dispute over the very issue, that there exists no agreement to arbitrate. The court is authorized to summarily and forthwith try the issue and render its decision upon the evidence submitted by the parties. A *"substantial and bona fide"* dispute provides a simple and clear requirement before the court can validly entertain such application. A *"substantial* and *bona fide"* dispute becomes an issue merely upon the opposing contentions of the parties that an agreement does or does not exist. The court then, in turn, is charged with the responsibility of determining upon the evidence if an agreement does exist. The court's determination does not and need not consider the validity of the alleged claims or rights under or subject to arbitration, but rather, the court's participation commences and ends with the determination if there is first any validly existing agreement between the parties to arbitrate. Upon a showing that there exists no such valid agreement, the court may stay threatened or previously commenced arbitration proceedings. Upon a showing that there exists such an agreement, the court merely denies the application for the stay of arbitration proceedings. This is precisely what the court herein did in conformity to § 435.355.2, and the contentions of Midwest that the court rendered its decision upon the merit of Midwest's claim is not supported by the evidence upon this record. The evidence, in fact, shows that there never was such an agreement between St. Luke's and Midwest within the wording and intent of § 435.350 or § 435.355.

■ What Midwest asserts is that it was entitled to the award of the contract because it submitted the lowest bid. That assertion was never before the trial court and is not present before this court. The reason that assertion was never before either court is that § 435.355 (see analysis above) limits the consideration by the trial court, and that limits the review by this court to the sole question or issue which is whether there existed an agreement between the parties to arbitrate. This cause was initiated upon an application to stay arbitration proceedings pursuant to § 435.-355, and the trial court properly disposed of that sole issue.

Another evidentiary note, additional to Midwest's exclusion as a "contractor" within the terms, definition, and intent of the contract, is the admission by Midwest that it never entered into any written agreement with St. Luke's for the construction of the flue recovery system.

■ To further its assertion, Midwest claims that it was a "prequalified" bidder and thus through custom and practice of the industry, Midwest was, because it submitted the lowest bid, either entitled to have the award of the contract *or* St. Luke's was required to reject all submitted bids. This assertion fails for three reasons. Contrary to the contention of Midwest, there is no evidence upon the record herein which describes or establishes a custom and practice that the "pre-qualified" bidder submitting the lowest bid must be awarded the contract. Secondly, neither upon this record nor at the time of oral argument before this court was a "pre-qualified bidder" ever clearly defined, and more importantly, it has never been sufficiently established that even if such a status is proven, that in every contract proposal is the so-called "pre-qualified bidder" automatically awarded the contract. What the evidence reveals is that St. Luke's, due to federal funding, was required to conduct an open bidding for the project. Originally, St. Luke's merely sought the opportunity to name or select a contractor. In response, St. Luke's reviewed several area contractors, including Midwest, whom St. Luke's determined were of "sufficient size to do the job." Five such contractors were chosen, including Midwest, and invitations for bids were sent to the five contractors.

Returning to the third and final reason that Midwest's assertion is not founded upon the record, it was the testimony of a witness for St. Luke's who made the selection for St. Luke's that based upon some thirty years experience in the industry, the custom and practice permitted rejection of the lowest bidder by the owner.

The evidence, in combination with the testimony of a St. Luke's representative and the bid invitation documents, fails to support Midwest's assertion of "pre-qualification bidders." The witness merely testified that the five contractors were selected because of "sufficient size" and declined to say that the five were selected because of any qualification. In addition, the bid invitation included a form needing completion on which each bidder was required to submit its qualification regarding ability to promptly handle additional work, skill, facilities, capacity, experience, previous work, and financial standing. It is evident that all bidders, including Midwest, were aware of the fact that St. Luke's both reserved the right and intended to review the qualifications of the bidders. To conclude otherwise would demand either that the qualification forms were excluded from consideration or that St. Luke's entered into a superfluous action by requesting its completion. This court cannot ignore that form as it is part of the evidence upon this record. In addition, it would defy logic to conclude that St. Luke's, by its inclusion in the bid invitation, intended a superfluous act under the particular circumstances herein.

It is equally clear from both the oral and documentary evidence that Midwest knew St. Luke's reserved the right to reject any bid.

■ Midwest cites to *Taft* and *Missouri Pacific* for the proposal that the trial court herein incorrectly entered its stay order because such stay order allegedly was contrary to § 435.355.5., which reads:

5. An order for arbitration shall not be refused on the ground that the claim in issue lacks merit or bona fides or because any fault or grounds for the claim

sought to be arbitrated have not been shown.

Neither *Taft* nor *Missouri Pacific* addresses the precise issue herein. *Taft* was a decision of the United States District Court, Western District of Missouri, which construed § 301 of the 1947 Labor Management Relations Act, 29 U.S.C.A. § 185, and addressed the limit or scope of an arbitration agreement of the parties. It did not address the question of whether there existed a written agreement to arbitrate as prescribed within § 435.350 and § 435.355.

*Missouri Pacific* was a case from the United States Court of Appeals, Eighth Circuit, which addressed the question of the applicability of the Federal Arbitration Act, 9 U.S.C. § 1, to disputes over track use as between railroad corporations and railroad subsidiaries. The case did not involve consideration or construction of the Uniform Arbitration Act. In addition to that case clearly defining federal policy, it is obvious that the parties in *Missouri Pacific* had entered into an agreement to arbitrate. The court was asked to determine if the issue was subject to arbitration and if the court could compel arbitration.

As a further note, *Builders Association* does not aid Midwest. That case, in turn, did not address the question whether there existed an agreement to arbitrate, but rather, the scope of a previously existing agreement to arbitrate.

■ As a second variation, or point (2), of the charged error, Midwest contends that since the project was partially funded by the federal government (Department of Energy), the project was thus subjected to the regulations of the Department of Energy which established that the bidders were "pre-qualified" and therefore St. Luke's was required to award the contract to the lowest bidder.

This court is referred to Regulation 9–1.-004(b), 10 CFR I I–600, 10 CFR § 600.-19(b)(2), OMB Circular A–110 Attachment 0 paragraph 3, and OMB Circular A–110 Attachment 0 paragraph 3(c)(5). Reliance upon the foregoing regulations does not aid

Midwest because a review of them does not disclose, contrary to the assertion of Midwest, that an owner must award, and the lowest bidder must receive, the contract in every case. When read in their entirety, the foregoing regulations still allow an owner to select the contractor on the owner's determination of which bid is most responsive to the invitation for the bid, and in addition to award the contract upon the bid most advantageous to the owner relative to the offer made by the owner.

As a final variation, or point (3), Midwest asserts that the trial court erred because St. Lukes, in fact, entered into a conditional bilateral contract with Midwest. This assertion is based upon what Midwest claims was a limited bid proposal to only pre-qualified bidders. Thus, Midwest reasons that an owner, when making bid proposals to "pre-qualified bidders," enters into a conditional bilateral contract with those bidders conditioned only upon final award and acceptance of the contract. Thus, Midwest further contends *Article 13*, being a part of these pre-contract proceedings coupled with custom and practice of the industry, bound St. Luke's to arbitrate. It is Midwest's contention that "pre-qualified bidders" have otherwise met the criteria prescribed by the owner, and thus only the project price remains for additional consideration between the parties. Midwest then concludes that the owner is thus bound to award the contract to the lowest bidder or the owner must reject all of the bids.

Midwest then opts for an additional position, asserting if the trial court correctly determined there existed no valid conditional bilateral contract, the trial court "should have recognized that at the very least, the doctrine of promissory estoppel required enforcement of St. Luke's promise to award the contract of the lowest bidder.

■ There is nothing upon the record herein which supports the assertion by Midwest that St. Luke's made any offer to any of the contractors, including Midwest, to

enter into a bilateral contract, conditional or otherwise. What the record discloses is that St. Luke's submitted to five contractors, including Midwest, invitations to bid the project. The contractors also knew of the reservations by St. Luke's to reject any bid. In addition, the invitation for bid included a requisite listing of qualifications from each contractor. The evidence fails to support Midwest's assertion that it, along with the other bidders, were "prequalified bidders." The invitation for bids from St. Luke's did not constitute an offer to any of the solicited bidders.[3]

This court is referred by Midwest to Closen and Werland, *"The Construction Industry Bidding Cases: Application of Traditional Contract, Promissory Estoppel, and other Theories to the Relators Between General Contractors and Subcontractors,* 13 John Marshall Law Review 565 (1980). While that is a well-done treatise, it is of little application herein because it deals with an entirely different proposal. The article considers bids between contractors and subcontractors and the reliance of the contractor when the bid is in turn submitted to the owner. There neither exists such a relationship between St. Luke's and Midwest, nor does this case in any manner involve any bid from a subcontractor.

■ The further contention of Midwest that if nothing else, St. Luke's was bound to award the contract to Midwest upon the theory of promissory estoppel, can be and is summarily disposed of by declaring there is no evidence upon this record showing any of the elements of the doctrine of promissory estoppel were established. The mere fact that Midwest incurred time and expense in preparation of its bid to St. Luke's does not establish a claim under the promissory estoppel.

In conclusion, although Midwest has presented a well-articulated argument, its claim must be denied. The determination by the trial court and this court on appeal

---

**3.** An invitation to submit a bid has been construed *not* to be an *offer*. *In re Cameo Tile Distributors, Inc.,* 17 B.R. 28, 29 (B.C.M.D.Fla. 1981). It is that view that this court adopts herein.

in the disposition of the appeal rests upon a sole and simple issue, to wit, the existence of any agreement between St. Luke's and Midwest to arbitrate within the purview and meaning of § 435.350 and § 435.355. In the absence of such an agreement, neither Article 13 nor any other part of the contract nor the bid documents have any relevancy to Midwest's claim to arbitration. The evidence clearly reveals there never was such an agreement between St. Luke's and Midwest. *Article 13* must be and is hereby construed to apply and bind only St. Luke's as owner to arbitration in regard to the matters prescribed within that article *and the contractor who was awarded the contract.* Midwest, as the evidence clearly reveals, does not qualify within Article 13 and hence, its claim of right to arbitration must fail.

As noted, § 435.355 has been construed herein. The trial court, upon the evidence herein, correctly ruled there was no agreement to arbitrate between St. Luke's and Midwest. In addition, the trial court correctly met its responsibility under and pursuant to § 435.350 and § 435.355.

There is no error and therefore the judgment must be affirmed.

All concur.