AMERICAN BUSINESS INTERIORS, INC., Appellee,

v.

HAWORTH, INC., Appellant.

No. 85–2071.

United States Court of Appeals, Eighth Circuit.

Argued April 17, 1986.

Decided Aug. 12, 1986.

---

Lawrence W. Bigus, Kansas City, Mo., for appellant.

J. Michael Cronan, Kansas City, Mo., for appellee.

Before LAY, Chief Judge, McMILLIAN,

Circuit Judge, and ROSENN,* Senior Circuit Judge.

ROSENN, Senior Circuit Judge.

This appeal raises an interesting question concerning ethics and impermissible conduct in the marketplace: what duties, if any, does a manufacturer owe its authorized dealer after it has notified the dealer that their relationship is terminated but before the termination is to take effect? Haworth, Inc., with headquarters in Holland, Michigan, manufactures office furniture, marketing it through direct sales and authorized dealers. American Business Interiors, Inc. (ABI), formerly an authorized dealer in Kansas City, Missouri, of Haworth furniture, asserts that Haworth prevented it from submitting a winning competitive bid to one of its major customers by refusing to provide requested pricing information ordinarily available to Haworth dealers.

ABI argues that the refusal to provide requested information tortiously interfered with its business expectancy from the bid, breached a contract, and violated Missouri's franchise statute. Prior to ABI's request for the pricing information, Haworth had notified it that the dealership was terminated, but the termination had not yet taken effect. A jury awarded ABI nominal actual damages of $1 for each of its three claims and $250,000 punitive damages for the tortious interference claim. The United States District Court[1] for the Western District of Missouri denied Haworth's motion for a new trial and entered judgment on the verdict. Haworth appeals, arguing inter alia that it owed no duty to supply ABI with the pricing information. We conclude that the district court correctly applied the law of Missouri[2] and affirm.

I.

Haworth selected ABI as an authorized systems office furniture dealer in 1973, sending it a fifteen-page manual entitled "Unigroup Dealer Polices." The manual stated that Haworth dealers "have undergone a very selective process" and listed specific qualifications dealers possessed. The manual obligated ABI to complete a detailed questionnaire, send all its sales employees to two-day training seminars, and use various Haworth promotional services. As a Haworth dealer, ABI was entitled to standard dealer discounts and in some circumstances to special terms. Sales to dealers not authorized by Haworth, described in the manual as "non-franchise dealers," were discouraged and permitted only through Haworth's regional offices. The manual provided that authorized dealerships could be terminated for stated causes, including poor performance, on 90 days notice by certified letter. Despite the obligations that the manual appears to impose on Haworth and ABI, neither party contends that it constitutes a contract.

Haworth permitted ABI as an authorized dealer to use the trademark Unigroup and the registered service marks ERA–1 and Haworth. It also authorized and partly paid for Yellow Page advertising in the Kansas City telephone directory listing ABI as one of three authorized Haworth dealers in Kansas City, Missouri.

Prior to becoming a Haworth dealer and through the period covered by this litigation, ABI had a business relationship with Johnson County Community College (JCCC) pursuant to which ABI sold JCCC furniture and office equipment in over 80 transactions. ABI had introduced Haworth products to JCCC in 1975. The college's facilities director, Gene Haun, testified that he respected ABI's president, Ha-

* Max Rosenn, Senior Circuit Judge, United States Court of Appeals for the Third Circuit, sitting by designation.

1. The Honorable Howard F. Sachs, District Judge, United States District Court for the Western District of Missouri.

2. This appeal arises out of a diversity action brought under 28 U.S.C. § 1332 (1982) and it is undisputed that Missouri law applies.

rold Caplan, and relied on his judgment in selecting furniture. As early as 1980 Caplan and Haun discussed using Haworth products in a project JCCC let for bid in January 1982. Several times before December 1981 Haun spoke further with Caplan and ABI sales personnel about the project, and at least once visited the ABI showroom to view Haworth products.

Haworth contends that it was dissatisfied with ABI's handling of its products since 1979, that it met with ABI in July 1981 and attempted to meet with ABI later to discuss termination, and that after an unsatisfactory October meeting, it decided to terminate ABI as a Haworth dealer. Haworth was disturbed particularly by a new budget image ABI had adopted, which it felt was inconsistent with the tone of other authorized dealers. In a letter dated December 1, 1981, Haworth notified ABI that because its sales volume was lower than Haworth had anticipated, "[e]ffective March 3, 1982, the Unigroup line will no longer be sold through [ABI]. Should you have any jobs pending, we will, of course, honor those orders if placed prior to the termination date."

On January 26, 1982, JCCC invited bids on the project it had previously discussed with ABI. The bids were due on February 12, and were to be kept open until March 24. ABI informed Haworth in a letter dated February 1, 1982, that it intended to bid on the JCCC job and requested information from Haworth about special discounts and other price information. Haworth evaded several telephone calls from ABI before replying. In a letter dated February 11, 1982, Haworth notified ABI that because it had been terminated, Haworth would not provide any information to aid ABI in winning the JCCC job or support or assist it on other new business that may have been initiated after Haworth's termination letter of December 1, 1981. James O'Dowd, a sales representative from Haworth's regional office, informed Haun sometime before bids were submitted that after ABI was terminated as an authorized dealer on March 3, it would not be able to service

Haworth products. ABI did not submit a bid.

ABI produced evidence that Haworth, contrary to its stated and usual practice, had discussed possible bids and profit margins with two other dealers interested in the JCCC job. O'Dowd apparently advised Schooley, Inc., a newly authorized dealer of Haworth products, to raise its bid to allow a higher profit margin. He then advised Rainen Business Interiors, the third authorized Haworth dealer in Kansas City, what percentage off list price would win the JCCC job. This suggested price was lower than what Schooley was advised to submit. O'Dowd's brother-in-law worked for Rainen and they gave him the JCCC account when Rainen's bid was ultimately accepted.

Using the information Haworth had given Schooley and Rainen about available discounts and ABI's documented prior pricing practices, ABI produced an estimated bid at trial that would have been lower than its Haworth competitors and which would have provided a total profit of around $21,000. Haworth questions whether the bid would have been accepted, because following Haworth's termination letter of December 1, ABI could not keep the bid open as required until March 14 and because it had inadequate credit. The invitation to bid provided that JCCC could waive any irregularities in bids, however, and Haun testified that ABI's bid probably would have been considered if it could have been kept open for a week after JCCC's board met to choose the winning bidder for the project. The board met February 17, and ABI's termination as a dealer did not take effect until March 3, more than a week later.

ABI expended some effort in preparing to submit a JCCC bid. It submitted evidence showing that four ABI employees made a sales presentation to Haun, an employee spent two to four hours sketching the bid and making list price calculations on nearly all the 86 bid items, ABI sought information about subcontracting wiring work, and ABI sought the price information from Haworth. These efforts were

concentrated in the few days preceding Haworth's refusal to provide information and there is no evidence that ABI bypassed or jeopardized other business opportunities by attempting to prepare the JCCC bid.

The jury found for ABI on its claims for tortious interference, violation of the franchise statute, and breach of contract, awarding $1 nominal actual damages on each claim and $250,000 punitive damages on the tortious interference claim.

## II.

Haworth appeals on numerous grounds, many of which the district court considered and rejected in denying Haworth's motions for summary judgment, directed verdict, judgment notwithstanding the verdict (NOV), and a new trial. Haworth makes no effort to distinguish the various bases for the relief it seeks or the relative importance of the issues it presents.

The district court instructed the jury that it could only award punitive damages in connection with ABI's tortious interference claim, and Haworth does not contend that the court's charges on breach of contract and violation of the franchise statute prejudiced the jury and resulted in the punitive damage award. Therefore, ABI's contract and franchise claims are important to the parties only insofar as they bolster the tortious interference claim. Even if this court agrees with Haworth that the jury should not have been charged on the contract and franchise claims, the punitive damage award might stand and the judgment against Haworth be reduced by only two dollars.

In accordance with this circuit's general practice, we view the district court's rulings on the law of the state in which it sits with substantial deference, rejecting its interpretations only when they are fundamentally deficient in analysis or otherwise lacking in reasoned authority. *Dabney v. Montgomery Ward & Co., Inc.,* 761 F.2d 494, 499 (8th Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 233, 88 L.Ed.2d 232 (1985). In reviewing the district court's denial of Haworth's motions for a directed verdict

and—judgment NOV, we view the evidence, together with all reasonable inferences to be drawn therefrom, in the light most favorable to ABI, the non-moving party. *SCNO Barge Lines, Inc. v. Anderson Clayton & Co.,* 745 F.2d 1188, 1192 (8th Cir.1984). The district court's denial of a new trial is reversible only for a clear abuse of sound discretion. *Id.* at 1193; *Chohlis v. Cessna Aircraft Co.,* 760 F.2d 901, 906 (8th Cir.1985). For those aspects of the district court's jury instructions that were timely objected to by Haworth, as required under Fed.R.Civ.P. 51, we will reverse where the instructions taken in their entirety do not fairly and adequately state the law. *Des Moines Board of Water Works v. Alvord, Burdick & Howson,* 706 F.2d 820, 823 (8th Cir.1983). Accordingly, we review the record and the law pertaining to each of the plaintiff's claims.

### A.

■ Missouri defines a franchise as a written or oral arrangement for a definite or indefinite period, in which a person grants to another person a license to use a trade name, trademark, service mark, or related characteristic, and in which there is a community of interest in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

Mo.Ann.Stat. § 407.400 (Vernon 1979). Barring circumstances not present here, a franchisor terminating a franchise must give the franchisee 90 days written notice. Mo.Ann.Stat. § 407.405. Courts have referred to interpretations of New Jersey's very similar statutory definition of "franchise" in interpreting the Missouri statute. *See Brown-Forman Distributors Corp. v. McHenry,* 566 S.W.2d 194, 196 (Mo. in banc 1978); *ABA Distributors, Inc. v. Adolph Coors Co.,* 542 F.Supp. 1272, 1287–88 (W.D. Mo.1982). Both the parties and the district court in the present case rely heavily on New Jersey cases. As recognized in *Neptune T.V. v. Litton Microwave,* 190 N.J.Super. 153, 462 A.2d 595, 598 (1983), the statute establishes two definitional criteria for

a franchise, both of which must be met: (1) the grant of a license in the franchisor's trade name, and (2) a community of interest in a business enterprise. Because Haworth profited from ABI's sales, it does not contend that there was no community of interest.

Haworth argues that because ABI "has never called itself Haworth, never operated under the name Haworth and never been told by anyone from Haworth that [it] could call itself Haworth," ABI was not in possession of a license to Haworth's trade name as required for franchises. In *Neptune*, however, the plaintiff franchisee used the trade name of the defendant in the same manner as ABI used Haworth's trade name. Neptune held itself out to the world as an authorized service center, without forsaking its own separate identity, and yet it was entitled to protection under the New Jersey franchise act. The *Neptune* court had no difficulty finding that a plaintiff in ABI's position possessed a license:

> [L]imited use by an independent contractor of another's trade name in that contractor's own business advertising does not *ipso facto* constitute a license to use a trademark within the intendment of franchise legislation. This is so because *a hallmark of the franchise relationship is the use of another's trade name in such a manner as to create a reasonable belief on the part of the consuming public that there is a connection between the trade name licensor and licensee by which the licensor vouches, as it were, for the activity of the licensee in respect of the subject of the trade name....* We are satisfied that this hallmark was present here since by its designation of Neptune as an authorized service center and its authorization to Neptune to hold itself out as such in its advertising, Litton gave its imprimatur to Neptune's business enterprise in respect of Litton's product and induced the consuming public to expect from Neptune a uniformly acceptable and quality controlled service endorsed by Litton itself.

462 A.2d at 599 (emphasis added). Nor do court decisions in other jurisdictions with similar statutory definitions of franchise support Haworth's more restrictive interpretation.[3] By the terms of the dealer manual and their subsequent dealings, ABI was entitled to call itself an authorized Haworth dealer and to use Haworth's various trade names, and was required to present Haworth products to the public in a certain manner, using employees trained by Haworth. Haworth partly paid for Yellow Pages advertisements describing ABI as an authorized dealer for it. Haworth decided to terminate ABI's dealership in part because ABI's budget image was inconsistent with that of Haworth's other authorized dealers. These circumstances establish that ABI is a franchisee under the terms of the Missouri franchise statute.

**3.** No state's definition of franchise is identical to Missouri's. The New Jersey statute is closest, but as the district court noted, its definition is narrower than Missouri's, because it does not include oral arrangements. *See* N.J.Stat.Ann. § 56:10–3(a) (West Supp.1985). Several other states use substantially identical language to define a franchise, but impose the additional requirement that the franchisee pay the franchisor a franchise fee or other consideration. *See, e.g.,* Hawaii Rev.Stat. § 482E–2; Minn.Stat. § 80C.01(4)(a); Miss.Code Ann. § 75–24–51(6); S.D.Codified Laws Ann. § 37–5A–1; Wash.Rev. Code § 19.100.010(4); Wisc.Stat.Ann. § 135.-02(2) ("Dealership"). (Statutes reprinted in 15B & 15C G. Glickman, *Business Organizations* (1986).)

Our examination of court decisions construing these statutes reveals readings of "license" at least as broad as given in New Jersey by the *Neptune* court. *See, e.g., Wilburn v. Jack Cartwright, Inc.,* 719 F.2d 262, 265 (7th Cir.1983) (definition of dealership under Wisconsin statute requires that dealer be authorized to use trade name to identify its business as furnishing the quality service associated with the grantor); *RJM Sales & Marketing, Inc. v. Banfi Products Corp.,* 546 F.Supp. 1368, 1373 (D.Minn.1982) (license requirement satisfied where alleged franchisee was authorized to distribute advertising material bearing the franchisor's trade name); *Huebner v. Sales Promotion, Inc.,* 38 Wash.App. 66, 684 P.2d 752, 755 (1984) (franchise granted plaintiff permitted to describe itself as an authorized specialist in the service designated by trademark), *cert. denied sub nom. Satterfield v. Huebner,* —— U.S. ——, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985).

We agree with ABI and the district court that the statute's requirement that a terminated franchisee be given 90 days written notice of termination is rendered meaningless if at any time without warning the franchisor can refuse to do business with the franchisee. *See Carlos C. Gelardi Corp. v. Miller Brewing Corp.*, 502 F.Supp. 637, 653 (D.N.J.1980) (New Jersey franchise statute covers indirect termination through failure to deal fairly with franchisees); *Coast to Coast Stores (Central Organization), Inc. v. Gruschus*, 100 Wash.2d 147, 667 P.2d 619, 628 (1983) (Dore, J., dissenting) (franchise agreement is terminated in fact under Washington statute when the means of continuing the franchised business are taken away). *Cf. Meyer v. Kero-Sun, Inc.*, 570 F.Supp. 402, 407 (W.D.Wisc.1983) (grantor effectively terminated dealership by imposing substantial changes on the dealer at the time of renewal, although injunctive relief from changes in competitive circumstances under the Wisconsin statute takes the place of termination remedies); *Imperial Motors, Inc. v. Chrysler Corp.*, 559 F.Supp. 1312, 1315 (D.Mass.1983) (federal Dealers' Day in Court Act allows recovery where coercion or intimidation amount to a constructive termination). *But see Coast to Coast Stores*, 667 P.2d at 622–23 (a franchise is conceptually distinct from the franchisee's business and even when, at the franchisor's insistence, the business ceases, the franchise continues until the agreement by which the franchisee could use the trade name is terminated).

When Haworth wrote ABI on February 11, refusing to provide information ABI needed to conduct its business with JCCC, Haworth in effect terminated ABI's franchise less than 90 days after its December 1 written notice. A franchisee may sue to recover damages, including loss of good will, costs of the suit, and proper equitable relief, following a franchise termination without the requisite notice. Mo.Ann.Stat. § 407.410(2). The district court did not err in submitting ABI's franchise claim to the jury, and viewed in the light most favorable to ABI, the evidence is sufficient to support the jury finding that Haworth violated the statute.

■ We reject as without merit Haworth's contention that the district court erred by substituting the phrase "right to use as one's own" for the word "license" in its jury instruction on the franchise statute. "A district court has broad discretion in framing the form and language of the charge to the jury, and as long as the entire charge fairly and adequately contains the law applicable to the case, the judgment will not be disturbed on appeal." *Des Moines Board of Water Works*, 706 F.2d at 823. The court's charge fairly stated Missouri franchise law.

### B.

■ We turn to ABI's claim of breach of contract. ABI seeks to read Haworth's December 1 termination letter as a unilateral contract obligating it to provide information to ABI. It argues in the alternative that promissory estoppel principles should apply because it made efforts to structure and submit a bid to JCCC in detrimental reliance on the letter. In relevant part, the termination letter provided: "Should you [ABI] have any jobs pending, we will, of course, honor those orders if placed prior to the termination date."

Under Missouri law, a unilateral contract is one that depends upon the wish, will or pleasure of one of the parties. *Becker v. City of Missouri*, 689 F.2d 763, 766 (8th Cir.1982). It becomes complete when accepted by performance of the act called for in the offer. *Id.* The district court instructed the jury that six elements needed to be satisfied for ABI to recover for breach of contract: Haworth's December 1 letter constituted an offer to honor orders ABI placed by March 3 on business it had pending December 1; the JCCC job was pending as of December 1; when ABI requested pricing information, Haworth knew it was for the JCCC job; Haworth routinely supplied pricing information to its dealers; Haworth did not supply the requested information "or otherwise assist

[ABI] in processing an order"; and ABI suffered damages. Although the district court did not charge the jury on promissory estoppel, ABI introduced evidence of its efforts in preparing the JCCC bid. In denying Haworth's motions for a new trial or judgment NOV, the district court found that the evidence sufficed to show detrimental reliance as an alternate ground for the breach of contract verdict.

To the extent the district court's construction of the contract and its legal effect relies on the contract terms and not on extrinsic evidence, its interpretation is a conclusion of law over which we have plenary review. *Amerdyne Industries, Inc. v. POM, Inc.,* 760 F.2d 875, 877 (8th Cir. 1985). The district court found and instructed that Haworth's letter offered to honor orders for jobs pending as of the date the letter was sent, December 1, rather than the termination date, March 3. Such an interpretation is inconsistent with the requirements of the franchise statute, as we discussed above, and also with the termination procedures Haworth laid out in its manual.[4] Under the district court's interpretation, Haworth effectively terminated ABI as an authorized dealer, in significant part, when without prior written notice it sent the December 1 letter.

Although we have some doubt that ABI's discussions with JCCC before December 1 made the JCCC job pending business as of that date, there is some evidence in the record from which the jury might so conclude. As we have just stated, however, the district court misconstrued the contract terms in a way overly favorable to Haworth by not extending the period covered by pending business to March 3. The evidence that the JCCC job was pending business before March 3 is more than sufficient to support the jury's verdict.

Haworth also argues that ABI never accepted the offer by making an order, and thus that there was no unilateral contract. Read into every Missouri contract, however, is a duty of good faith and fair dealing in its performance. *Bain v. Champlin Petroleum Co.,* 692 F.2d 43, 47 (8th Cir. 1982); *see* Restatement (Second) of Contracts § 205 (1981). Each party must do nothing destructive of the other party's right to enjoy the fruits of the contract and do everything that the contract presupposes they will do to accomplish its purpose. *Conoco Inc. v. Inman Co.,* 774 F.2d 895, 908 (8th Cir.1985).[5] Implicit in Haworth's offer to accept orders must be an offer to provide pricing information that ABI would need to make an order. Haworth could not reasonably expect ABI to order goods at unknown prices. ABI's inquiry was the necessary preliminary to an order, and once Haworth sent ABI its February 11 letter refusing to provide price information, ABI could not be expected to place an order. Further, the record contains sufficient evidence for the jury to find that ABI might have won the bid and placed an order before March 3, had Haworth provided the requested information.

Haworth also takes issue with the district court's refusal to charge the jury on detrimental reliance, but detrimental reliance is not required for a valid unilateral contract. *See Becker,* 689 F.2d at 766. Because the evidence is sufficient to support ABI's contract claim, we need not review the district court's alternative arguments regarding detrimental reliance.

## C.

█ Finally, the last claim we review is plaintiff's complaint of tortious interference with its business relationship with JCCC. The elements necessary to estab-

---

4. The manual provides: "If there is no significant performance improvement ... a final certified letter will be prepared advising you that *after 90 days,* you will no longer be authorized to sell the Unigroup line." (Emphasis added.)

5. We need not consider here whether the Missouri franchise statute independently imposes a

duty of good faith and fair dealing, although one court has already so held. *ABA Distributors,* 542 F.Supp. at 1286; *see Arnott v. American Oil Co.,* 609 F.2d 873, 881–84 (8th Cir.1979) (applying South Dakota law), *cert. denied,* 446 U.S. 918, 100 S.Ct. 1852, 64 L.Ed.2d 272 (1980).

lish a prima facie case of tortious interference with a business relationship under Missouri law are well settled:

> (1) A contract or a valid business relationship or expectancy (not necessarily a contract);
>
> (2) Defendant's knowledge of the contract or relationship;
>
> (3) Intentional interference by the defendant inducing or causing a breach of the contract or relationship;
>
> (4) The absence of justification; and
>
> (5) Damages resulting from defendant's conduct.

*Rusk Farms, Inc. v. Ralston Purina,* 689 S.W.2d 671, 679 (Mo.Ct.App.1985); *Fischer, Spuhl, Herzwurm & Associates, Inc. v. Forrest T. Jones & Co.,* 586 S.W.2d 310, 315 (Mo. in banc 1979). The district court in the present case charged the jury that ABI could recover in tort if seven elements were satisfied: ABI had a prospective contractual relationship with JCCC; Haworth knew of the prospective relationship; by refusing to supply information ABI requested, Haworth prevented ABI from entering into the contractual relationship; Haworth's refusal was specifically intended to prevent ABI from contracting with JCCC; the refusal was not merely part of a uniform policy of Haworth's for terminated dealers; Haworth acted intentionally and without justification or excuse; and ABI was damaged.

At trial, Haworth criticized the court's instructions as assuming that Haworth had a duty to provide information on request to ABI. Haworth argued that the December 1 termination letter obligated it at most to accept orders and not to provide information, and that neither the manual nor the Missouri franchise statute require it to provide pricing information to its authorized dealers. On appeal, it also asserts that the evidence is insufficient to support most of the other elements required under Missouri law to establish tortious interference liability.

In Missouri, a reasonable expectancy of commercial relations is protected, even when there is no pre-existing contract or business relationship. *Fischer,* 586 S.W.2d at 980. A regular course of similar prior dealings may suggest a valid business expectancy. *See Rusk Farms,* 689 S.W.2d at 680–81. This court has repeatedly held that the prospect of winning a bid may constitute a reasonable expectancy of commercial relations supporting a tortious interference claim under Missouri law, where the plaintiff's prior relations with the customer soliciting bids or other circumstances suggest that it could successfully compete. *See Conoco Inc.,* 774 F.2d at 907 (even in a bidding situation, a 20–year relationship with a customer created a protectable business expectancy in a supplier); *Superturf, Inc. v. Monsanto Co.,* 660 F.2d 1275, 1286 (8th Cir.1981).[6] The Missouri courts will not impose greater strictures on bid formalities than are imposed by the parties. *See Briner Electric Co. v. Sachs Electric Co.,* 680 S.W.2d 737, 743 (Mo.Ct.App.1984). The invitation to bid stated that informalities or irregularities in bids could be waived, and Haun of JCCC testified that the credit terms of the bid were negotiable and the requirement it be kept open 30 days might be waived. Viewed in the light most favorable to the successful party in the district court, ABI's evidence of its extensive prior dealings with JCCC, its prior sales efforts with the college on this project, the high regard JCCC's Haun had for it, and ABI's consistent bidding meth-

---

**6.** Without reference to this circuit's opinions construing Missouri law on this point, Haworth argued in its brief and again forcibly at oral argument that a mere invitation to bid cannot rise to the level of a business expectancy supporting a tortious interference claim. In support Haworth relies generally on *St. Luke's Hospital v. Midwest Mechanical Contractors, Inc.,* 681 S.W.2d 482 (Mo.Ct.App.1984), and *State ex rel. Minnesota Mining and Manufacturing Co. v.* *Bradford,* 602 S.W.2d 37 (Mo.Ct.App.1980). These cases both confirm the unsurprising proposition that an invitation to bid does not convey the rights that follow from a contract signed by a winning bidder. 681 S.W.2d at 486 (invitation to bid does not give the right a contract would to arbitration); 602 S.W.2d at 40 (invitation to bid does not constitute a contract obligating invitor to accept lowest bidder). They offer no support for Haworth's position.

ods, taken together, suffices to show that it had a valid business expectancy.

Haworth next argues that ABI's evidence does not satisfy the causation requirement for tortious interference. In Missouri, a two-step "but for" test must be satisfied: (1) did the defendant take steps to induce loss of the business expectancy; and (2) would the expectancy have been satisfied absent the defendant's interference. *See Tri-Continental Leasing Co. v. Neidhardt,* 540 S.W.2d 210, 217 (Mo.Ct. App.1976) (test phrased in terms of breach of contract). Haworth contends that its refusal to supply requested special price information was not an active, affirmative step inducing a lost expectancy, and that ABI did not sufficiently prove it would have won the JCCC business with such information.

Haworth attempts to characterize its refusal to provide ABI with the requested information as a passive failure to act. Whether Haworth had an affirmative duty to cooperate with ABI and supply information is a troubling issue. Its decision not to give ABI the assistance it gave other authorized dealers, however, could be viewed by a jury as part of a concerted effort to deny ABI the JCCC job and divert the business to Rainen. This satisfied the first part of the causation test. *See Fischer,* 586 S.W.2d at 312, 315 (anti-competitive agreements denying plaintiff statistical data they needed to compete supported a tortious interference claim). ABI satisfied the second part of the causation test by evidence showing that it had a reasonable expectation of winning the JCCC job, and that JCCC awarded it to Rainen and Schooley, the beneficiaries of Haworth's supportive information.[7]

Haworth argues ABI failed to meet its burden of proving that Haworth was not justified in withholding information from ABI. Missouri follows a modern trend of placing the burden on a plaintiff of showing the defendant lacked justification for its interfering act. *See* W. Keeton & W. Prosser, *The Law of Torts* § 24:130 at 1011 (5th ed. 1984). The American Law Institute has also adopted this approach. *See* Restatement (Second) of Torts §§ 766B & 767 (1979). The Missouri courts have often quoted approvingly from various Restatement sections when considering tortious interference claims. *See Briner Electric Co.,* 680 S.W.2d at 742. ABI does not contend that Haworth lacked justification for deciding to terminate the authorized dealership. Its tortious interference claim is premised on Haworth's refusal to provide requested information during the 90 day period required by the termination notice. Despite Haworth's contrary contention, it may have lacked justification for refusing to provide information although it possessed justification for termination.

A lack of justification is proved where the means of interference is itself tortious or unlawful, but in some circumstances even conduct that is itself innocent may constitute unjustified interference. *See* Restatement (Second) of Torts §§ 766B comment e & 767 comment c (1979). In *Rusk,* for example, the defendant's misconduct consisted of letters urging potential buyers of the plaintiff's goods not to purchase them. 689 S.W.2d at 675. Although there was no contention that the letters were in themselves unlawful or tortious, e.g., their contents did not violate any statute or defame the plaintiff, nonetheless the court held that they subjected the defendant to liability. *Id.* at 679. Haworth argues that its failure to provide information was at most a breach of contract and was not unlawful or tortious, and that, because it had no duty to provide the information, its refusal was justified.

---

**7.** Haworth attempts to impose the additional requirement that conduct supporting a tortious interference claim must be directed at a third party, not the plaintiff. Although often acts that satisfy the causation requirement will be directed at the third person with whom the plaintiff had a business expectancy, conduct interfering with the plaintiff may suffice. Restatement

(Second) of Torts § 766B(b) (1979). Haworth submits no authority for imposing a third party requirement, and the district court acted correctly in not creating one. Further, O'Dowd's warning to JCCC that ABI could not service the contract were it the successful bidder amounted to some conduct supporting a claim of tortious interference directed toward a third party.

Conduct breaching a contract may also amount to an independent tort leading to liability, where a separate duty arises out of a contractual relationship. *John Deere Company of St. Louis v. Short,* 378 S.W.2d 496, 502 (Mo. in banc 1964); *see Morrill v. Becton, Dickinson & Co.,* 747 F.2d 1217, 1222 (8th Cir.1984). The duty claimed to have been violated may have its source in statutes, regulations, or considerations of public policy as developed by case law. *Groppel Co., Inc. v. U.S. Gypsum Co.,* 616 S.W.2d 49, 56 (Mo.Ct.App.1981). Conduct constituting a breach of contract will constitute tortious interference where an independent duty superimposed by operation of law is breached. *Meyer v. Bell & Howell Company,* 453 F.Supp. 801, 802 (E.D.Mo.), *appeal dismissed on other grounds,* 584 F.2d 291 (8th Cir.1978).

The district court concluded that ABI's breach of contract claim could support its independent tortious interference claim when coupled with evidence showing that Haworth intended the breach to deny ABI the opportunity to bid on the JCCC job. Relying on general tort principles elaborated by the Washington Supreme Court in *Cherberg v. Peoples National Bank of Washington,* 88 Wash.2d 595, 564 P.2d 1137, 1143 (1977), the district court found that a breach of contract intended to interfere with some business interest or relation of the adverse party will support a tortious interference claim. *See American Society of Contemporary Medicine, Surgery & Ophthamology v. Murray Communications, Inc.,* 547 F.Supp. 462, 465 (N.D.Ill. 1982) (similar holding, applying Illinois law).

Although we agree with the district court that conduct breaching a contract may constitute tortious interference where the elements of the tort have been satis-fied, we also conclude that Haworth in refusing to provide requested information violated duties independent of contract.[8] A jury could find that Haworth's refusal constituted a termination without requisite notice, in violation of the franchise statute and contrary to the dealer manual, and that when considered along with its other conduct in helping Rainen win the JCCC job, it evinced an intention to injure ABI by interfering with its prospective business relationship. Further, plaintiff presented sufficient evidence to the jury to find, as required by the court's instructions, that the refusal to provide requested information "was specifically intended to prevent plaintiff's contracting with [JCCC] ... [and] was not merely the result of a uniform practice of defendant to refuse information to any dealer scheduled for termination who is seeking to place orders for new business." Haworth's apparent misconduct in the diversion of the JCCC job to Rainen and O'Dowd's brother-in-law, and its attempt to prevent JCCC from receiving and considering ABI's bid while ABI was still an authorized dealer, suggests a conspiracy violative of public policy and perhaps of state and federal anti-trust laws. *See Premier Electrical Construction Co. v. Miller Davis Co.,* 422 F.2d 1132, 1137 (7th Cir.) (conspiracy preventing some bidders from receiving supplies at lower price violates Sherman Act), *cert. denied,* 400 U.S. 828, 91 S.Ct. 56, 27 L.Ed.2d 58 (1970); *Fischer,* 586 S.W.2d at 315 (conduct preventing competition for public business may violate Missouri's antitrust law). ABI produced sufficient evidence to support its burden of showing Haworth lacked justification for its action.

Haworth argues that the district court erred by not instructing the jury that they had to find a duty to provide ABI request-

---

**8.** The concurring and dissenting opinion concedes that the evidence is sufficient for the jury to have found Haworth violated the Missouri franchise statute by refusing to provide the requested information, but concludes that ABI has not made "a showing of commission of an independent tort or duty imposed by statute, regulation, public policy considerations ... or by operation of law that is independent of the undertaking imposed by the contract." First, the Mis-souri franchise statute, besides the contract, imposed a duty which the jury found Haworth violated. Second, there is considerably more evidence in this case than the refusal to furnish bid information, such as evidence showing that Haworth withheld information intentionally to deny ABI the opportunity to bid on the JCCC job and engaged in activity to divert the job to Rainen and O'Dowd's brother-in-law. *See infra* 1145–46.

**1146**

ed information for the tort claim to stand. The question whether a relationship exists between the parties supporting the imposition of a legal obligation is entirely one of law, to be determined by the court. W. Prosser & W. Keeton, *supra,* § 37 at 236. In light of the evidence supporting the jury's findings of liability for breach of contract and violation of the franchise statute, and the obligation created by the dealer manual, the district court did not err in implicitly finding Haworth had a duty to provide ABI the requested information.

Lastly, Haworth protests that ABI produced insufficient evidence of the damage it suffered by Haworth's refusal to provide information. Unavoidably, damage claims for the loss of prospective contractual relations are less certain than claims for loss of completed contracts. Following *Rusk,* however, damages are sufficiently proved by evidence that makes an inference that a business expectancy was lost more probable than not. 689 S.W.2d at 680. Once this burden is met, actual damage is proven, even if the evidence is insufficient to establish the amount of damage suffered.

> [F]or every actionable injury there is a corresponding right to damages, and such injury arises whenever a legal right of the plaintiff is violated. If there is no inquiry as to actual damages, or none appears on inquiry, the legal implication of damages remains and nominal damages are given.

*Id.* at 681. Here, as in *Rusk,* nominal actual damages of $1 were awarded. Such a nominal award needs no evidentiary support proving how much actual damage was suffered.

### III.

■ Haworth contends that the district court erred in refusing to grant a remittitur of the jury's $250,000 punitive damage award for tortious interference. Although state law principles govern in establishing whether punitive damages are available for a state law claim, *Kerr v.*

*First Commodity Corp.,* 735 F.2d 281, 289 (8th Cir.1984), the proper role of the federal courts in reviewing the size of jury verdicts is a matter of federal law. *Donovan v. Penn Shipping Co., Inc.,* 429 U.S. 648, 649, 97 S.Ct. 835, 836–37, 51 L.Ed.2d 112 (1977). Despite the apparent abolition of remittitur in the Missouri state courts, *Firestone v. Crown Center Redevelopment Corp.,* 693 S.W.2d 99, 110 (Mo. in banc 1985), remittitur is still available in federal court.

A district court should grant remittitur only when the verdict is so grossly excessive as to shock the court's conscience. *Ouachita National Bank v. Tosco Corp.,* 716 F.2d 485, 488 (8th Cir.1983) (in banc). This court, recognizing that the trial court has heard the evidence and knows the community's standards, will reverse a denial of remittitur only when in rare circumstances we are pressed to conclude that the verdict represents a monstrous or shocking injustice. *Vanskike v. Union Pacific Railroad Co.,* 725 F.2d 1146, 1149–50 (8th Cir.1984). As an appellate court, our scope of review over a damage award is "extremely narrow" and we may not reverse except for a manifest abuse of discretion. *Murray v. Fairbanks Morse,* 610 F.2d 149, 152–53 (3d Cir.1979).

We are guided by the law of the forum state in weighing the excessiveness of a verdict. *Vanskike,* 725 F.2d at 1150–51. In Missouri, there can be no punitive damages without some actual damages, however nominal.[9] *Melville v. Cheryl Scott Real Estate Co.,* 664 S.W.2d 529 (Mo.Ct. App.1983). Once some actual damages are found, however,

> [t]here is no fixed relation between the amount of actual (nominal) damages and the amount of punitive damages awarded. Once the trial court decides as a matter of law that the issue of punitive damages should go to the jury, then the matter is purely and peculiarly one for the jury's discretion and is not to be reversed except on a clear showing of abuse of discretion.

**9.** Because the jury awarded only nominal actual damages, we need not review Haworth's argument that uncertainties in the installation cost of the JCCC job might have increased ABI's expenses and lowered its profits. An actionable injury, even without proof of actual damages, suffices to support nominal actual damages. *Rusk,* 689 S.W.2d at 680.

*Labrier v. Anheuser Ford, Inc.*, 621 S.W.2d 51, 58 (Mo. in banc 1981) (citations omitted) (accepting a ratio of $32,000 punitive damages to $1 actual damages, and noting previous accepted awards of $20,000 to $1, $27,500 to $1, and $75,000 to $1). In *Rusk*, a tortious interference action against a large company by one of its suppliers, an award of $200,000 punitive damages from the jury was accepted on appeal as not "manifestly unjust" although the actual damages were remitted from $20,000 to $1 because the evidence was insufficient to quantify the actual loss. 689 S.W.2d at 683. Haworth has a net worth in excess of $47 million.

We recognize that Haworth's actions caused no physical injuries and were not shown to damage ABI in any of its other dealings. In light of the considerable deference Missouri courts give punitive damage awards of this magnitude, and the evidence suggesting Haworth's actions were part of a conspiracy to aid another of its dealers, however, we cannot say that the district court abused its discretion in sustaining the award.

### IV.

Viewed in the light most favorable to ABI, the evidence is sufficient to sustain the jury verdict against Haworth. We see no indication that the district court abused its sound discretion in not granting a new trial. Accordingly the judgment of the district court is affirmed.

McMILLIAN, Circuit Judge, concurring in part and dissenting in part.

I concur in part and dissent in part. I agree entirely and concur with the court's holding that appellee was a franchisee within the meaning of the Missouri franchise statute; that the 90–day termination notice given was meaningless if at any time without warning the franchisor could refuse to do business, and that a reasonable jury could and did find in favor of appellee for a franchise statutory violation.

I also agree with the court's holding that the failure of appellant to furnish bid information within the 90–day termination notice period was a contract violation under the peculiar circumstances in this case.

On the other hand, I do not agree and dissent from the court's holding that under Missouri law appellee has made a showing of commission of an independent tort or duty imposed either by statute, regulation, public policy considerations as developed by case law or by operation of law that is independent of the undertaking imposed by the contract. Here, appellee's abortive attempt to terminate the contract and its refusal to furnish bid information at best is a mere contract violation. To adopt the majority analysis is to make every contract violation into an intentional tort founded upon the creative imagination of counsel.

Consequently, I would reverse and remand the case to the district court with instructions: (1) to affirm the judgment on the contract claim and franchise violation, and (2) to reverse and dismiss the judgment on the interference with contract claim.