Richard MASSEY; Massey–Wilcoxen, Inc.; Massey Enterprises, Inc., Plaintiffs–Appellants,

v.

TANDY CORPORATION, a Delaware Corporation, Defendant–Appellee.

No. 92–2285.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1993.

Decided March 8, 1993.

Rehearing Denied April 15, 1993.

**1308**

James J. Sauter, St. Louis, MO, argued, for plaintiffs-appellants.

David Wells, St. Louis, MO, argued (Lawrence C. Friedman and John J. Carey, on brief), for defendant-appellee.

Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.

FLOYD R. GIBSON, Senior Circuit Judge.

Massey–Wilcoxen, Inc. ("MWI") and Massey Enterprises, Inc. ("MEI") appeal the district court's[1] entry of judgment as a matter of law on their claims that Tandy Corporation tortiously interfered with their legitimate business expectations. MWI, MEI, and Richard Massey appeal the court's entry of judgment as a matter of law on their claim that Tandy violated express and implied covenants of good faith and fair dealing. We affirm the district court in all respects.

## I. BACKGROUND

Massey and George Wilcoxen operated a Radio Shack store in Ballwin, Missouri pursuant to a franchise agreement executed with Tandy in 1971. In 1976, the Chesterfield Mall opened approximately six miles from the Ballwin store. Tandy planned to open a company-owned store in Chesterfield Mall and signed a lease with the mall's owner, Jacobs, Visconsi and Jacobs ("JVJ"). Massey and Wilcoxen complained about the intrusion of the company-owned store into their sales territory. As a result, Tandy agreed to transfer the partners' franchise to the Chesterfield Mall and assigned its lease at the mall to the partners. In February 1980, Tandy, Massey, and Wilcoxen executed a new franchise agreement for the Chesterfield Mall. In September 1985, the partners formed MWI, which owned and operated the Chesterfield Mall store from that time forward; however, MWI did not become a party to the franchise agreement, nor was the lease assigned to MWI.

In 1986, Massey attempted to buy another Radio Shack franchise from its owner. The sale of this location (which was located in Creve Coeur) was approved by Tandy and completed in August. Massey formed MEI to own and operate this store but, unlike the Chesterfield Mall location, the Creve Coeur location did not do well. Massey voluntarily closed the store in June 1988.

Meanwhile, at approximately the same time he was negotiating for the purchase of the Creve Coeur location, Massey contacted Tandy to find out how to renew the lease at Chesterfield Mall, even though the lease was not due to expire for another year. In July 1986, Tandy received a letter from the leasing company stating that Massey's lease would not be renewed; for reasons that are never explained, this letter was not forwarded to Massey. Massey

---

**1.** The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

received a copy of a second, similar letter in November 1986.

Massey tried to sell the franchise, but was not successful. At the time the lease expired, Massey had not found a new location. He eventually found a new location in strip mall less than one-half mile from Chesterfield Mall. The store was never successful at its new location, and it closed in August 1988. The closing of the store terminated the franchise agreement with Tandy. The franchise agreement granted Massey an area of primary responsibility (AOPR) that effectively prevented Tandy from opening any company-owned stores within a certain distance of his franchise without giving him an option to own the new location; with the closing of Massey's store and the termination of the franchise agreement, Massey's area of primary responsibility dissolved. In April 1990, Tandy opened a company-owned store in Chesterfield Mall. Meanwhile, the Creve Coeur location also experienced financial difficulties, and was closed in June 1989. Tandy opened a company-owned store in Creve Coeur in February 1991.

Massey, MEI, and MWI (but not Wilcoxen) sued Tandy. Count I alleged that Tandy breached express and implied covenants of good faith and fair dealing by charging excessive wholesale prices. Count II, alleging breach of fiduciary duty, was voluntarily withdrawn by Massey before it was submitted to the jury. Count III alleged Tandy had tortiously interfered with Massey's lease at Chesterfield Mall. At the close of evidence, the district court entered judgment as a matter of law against all three plaintiffs on Count I because the allegations were not supported by either the facts or the law. The court also entered judgment as a matter of law against MWI and MEI on Count III. Count III was submitted to the jury as to Massey, and the jury found in favor of Tandy.[2]

**2.** Massey does not appeal the jury's verdict as to his claim under Count III.

**3.** The nomenclature for motions filed pursuant to Fed.R.Civ.P. 50(a)(1) was changed, effective

## II. DISCUSSION

### A. Standard of Review

■ We review a district court's entry of judgment as a matter of law de novo, affirming if "the evidence is such that, without weighing the credibility of the witnesses, there can be but one reasonable conclusion as to the verdict." *Caudill v. Farmland Indus., Inc.*, 919 F.2d 83, 86 (8th Cir.1990).[3]

### B. Breach of Covenant of Good Faith and Fair Dealing

Two clauses of the franchise agreement are relevant to this claim. The first is the covenant of good faith and fair dealing, which stated "Neither Tandy nor Franchisee shall do or fail to do anything which would deprive the other party of the benefits of this Agreement, meaning that both Tandy and Franchisee shall be governed by the standards of good faith and fair dealing." The second is a provision requiring that a certain amount of merchandise be purchased from Tandy. The contract did not specify the prices Tandy would charge for this merchandise. The gravamen of the plaintiffs' claim is that Tandy breached the covenant of good faith by charging an excessive amount of money for the merchandise it sold him. They do not contend Tandy charged them more than it charged other franchises; rather, they contend the formula used by Tandy to calculate the price was irrational and calculated to make profits extremely difficult to obtain.

■ The franchise agreement states the amount charged for merchandise "shall be determined in accordance with the prices appearing in Tandy's preprinted purchase order form current on the date of billing." By relying on the covenant of good faith, Massey seeks to implicitly inject additional terms governing this issue. Such additional terms cannot be added by relying on the covenant of good faith. *So Good Potato Chip Co. v. Frito–Lay, Inc.*, 462 F.2d 239,

December 1, 1991. However, the Advisory Committee's notes make clear that the standard for entering and reviewing such motions remains the same.

241–42 (8th Cir.1972) (Missouri law); *Glass v. Mancuso,* 444 S.W.2d 467, 478 (Mo.1969); *Exxon Corp. v. Atlantic Richfield Co.,* 678 S.W.2d 944, 947 (Tex.1984); *Adolph Coors Co. v. Rodriguez,* 780 S.W.2d 477, 482 (Tex. Ct.App.1989).[4] Although these cases involved implied covenants of good faith and the franchise agreement contains an expressed covenant of good faith, we think the reasoning of those cases would still apply. The parties agreed that Tandy could establish the prices. By addressing the issue of merchandise pricing, the parties have precluded the use of additional, implied terms relating to that issue.

### C. Tortious Interference with Business Expectations [5]

■ The tort of interference with a business expectancy has the following elements: "(1) a contract or a valid business expectancy; (2) defendant's knowledge of the contract or relationship; (3) intentional interference by the defendant inducing or causing a breach of the contract or relationship; (4) absence of justification; and, (5) damages resulting from defendant's conduct." *Community Title Co. v. Roosevelt Fed. Sav. & Loan Ass'n,* 796 S.W.2d 369, 372 (Mo.1990) (en banc). Our independent review of the record verifies that elements one and three were not sufficiently developed to withstand Tandy's motion for judgment as a matter of law.

#### 1. Business Expectancy

■ MWI and MEI correctly point out that a contract need not exist in order to satisfy the first element; all that is needed is a valid business expectation. "A regular course of similar prior dealings may suggest a valid business expectancy." *American Business Interiors v. Haworth, Inc.,* 798 F.2d 1135, 1143 (8th Cir.1986) (citing *Rusk Farms, Inc. v. Ralston Purina,* 689 S.W.2d 671, 680–81 (Mo.Ct.App.1985)). Here, the lease was silent on the subject of

renewal, and there was no regular course of dealings demonstrating the plaintiffs had any expectation JVJ would renew the lease. The evidence does not demonstrate any basis upon which the plaintiffs could reasonably expect a renewal. *Cf. Hartbarger v. Burdeau Real Estate Co.,* 741 S.W.2d 309, 311 (Mo.Ct.App.1987); *Rusk Farms,* 689 S.W.2d at 680–81 (one transaction insufficient to prove continuing relationship).

We also note that MEI never had any dealings with JVJ, and therefore could hardly claim any expectation of continued business relations with the landlord. MEI contends it expected to reap the benefits of Massey's and MWI's relationship with JVJ because profits from the Chesterfield Mall location would be used to improve the Creve Coeur store. Accepting this as true (which we must, given our standard of review), this does not satisfy the requirement that the plaintiff suffer interference with its own business relationships; at best, it demonstrates damage caused by interference with another entity's business relations, but this is not what the first element requires.

#### 2. Intentional Interference Causing a Breach

After reading the transcript, we have found no evidence that Tandy attempted to persuade JVJ to take any particular course of action with regard to the lease. The only contact appears to have taken place after JVJ made its decision, when Tandy called JVJ and tried to arrange a meeting between JVJ and Massey.

MWI and MEI point to the suspicious circumstances surrounding the two notices, the fact that Tandy has a company-owned Radio Shack in virtually every Mall owned by JVJ, the fact that Tandy opened a Radio Shack in Chesterfield Mall as soon as it could do so without interfering with Mas-

---

**4.** We have cited cases from both Missouri and Texas because the district court did not determine which forum's law governed the contract, and we find it unnecessary to do so because it would not make any difference in the outcome of this case.

**5.** Massey contends these arguments were initially presented to the district court at the eleventh hour (during the instruction conference, to be precise) and thus should not have been considered. Our review of the record reveals otherwise.

sey's AOPR, and the questionable justifications for JVJ's decision not to renew his lease. From these facts, we are to infer that Tandy used its influence to get rid of Massey and open a company-owned store in the mall. These speculative inferences do not satisfy Massey's obligation to present substantial evidence supporting each element of the cause of action. *Morton v. Hearst Corp.*, 779 S.W.2d 268, 272 (Mo.Ct. App.1989).

MWI and MEI alternatively argue that the good faith clause required Tandy to exert its influence and "force" or persuade JVJ to renew the lease. Even if the record is read in the light most favorable to the plaintiffs, the record does not substantiate that Tandy could accomplish this task. At best, the record reflects that Tandy's desires were important to JVJ, but that Tandy did not always get what it wanted. Furthermore, as in *American Business Interiors*, whether Tandy had an affirmative duty to intercede is a "troubling issue." 798 F.2d at 1144. However, we do not even need to decide whether Tandy had such an obligation because there is no indication that Tandy treated MWI and MEI different than any other franchisees by refusing to exert pressure on JVJ. *Cf. id.* ("decision not to give [plaintiff] the assistance it gave other authorized dealers, however, could be viewed by a jury as part of a concerted effort to deny [plaintiff] the ... job and divert the business to [another individual].")

## III.  CONCLUSION

The district court correctly entered judgment in favor of the defendants and is therefore affirmed.