**TRI STATE HDWE. INC., Plaintiff,**

v.

**JOHN DEERE COMPANY, Defendant.**

**No. 06–5020–CV–SW–FJG.**

United States District Court,
W.D. Missouri,
Southwestern Division.

Jan. 18, 2008.

Merl Lynn Stanley, Ron E. Mitchell, Blanchard, Robertson, Mitchell & Carter, Joplin, MO, for Plaintiff.

David T.M. Powell, Timothy K. McNamara, Lathrop & Gage, L.C., Kansas City, MO, for Defendant.

## ORDER

FERNANDO J. GAITAN, JR., Chief Judge.

Currently pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 71) and Suggestions in Support (Doc. No. 73).

## I. BACKGROUND[1]

This is an action arising out of a franchise agreement between the parties in

---

1. In accordance with Local Rule 56.1(a), "[a]ll facts set forth in the statement of the movant shall be deemed admitted for the purpose of summary judgment unless specifically controverted by the opposing party." *See* *Ruby v. Springfield R–12 Public School Dist.*, 76 F.3d 909, 911 n. 6 (8th Cir.1996). Accordingly, all facts set forth in the Court's statement of facts will be taken from defendant's motion for summary judgment (Doc. No. 71) and its suggestions in support (Doc. No. 73) unless otherwise specified.

which plaintiff, Tri–State Hardware, Inc. ("Tri–State"), had an agreement with defendant, John Deere Company ("John Deere"), to sell and service John Deere products. Tri–State brought a three-count petition alleging that (1) John Deere wrongfully terminated Tri–State's franchise, (2) breached the contract between the parties, and (3) interfered with Tri–State's business expectancy. John Deere seeks summary judgment on all of Tri–State's claims.

Defendant John Deere is an international manufacturer of farm equipment. In the United States, John Deere is subdivided into six different branches, one of which is centered in Kansas City. The Kansas City Branch is further subdivided into three different Divisions, and each Division is divided into various Territories.

Prior to its termination, plaintiff Tri–State was located in South West City, Missouri and served as a John Deere dealer for decades. Charles and Judy Wolfe were the owners of the Tri–State dealership. Tri–State's non-exclusive trade territory, known as its Area of Responsibility ("AOR") included nearly all of McDonald County, where Tri–State was based and portions of several surrounding counties.

On October 7, 1985, the parties signed the current John Deere Agricultural Dealer Agreement (the "Agreement"). Section 1(a) of the Agreement states in relevant part:

> The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Conditions of Sale. Even though an order has been accepted, the Company has the right to refuse to ship Goods and shall have no liability to the Dealer for such refusal or for any delay or other failure to ship or deliver Goods as provided in the Conditions of Sale or Section 4 hereof.

Further, Section 1(d) of the Agreement provides that, "The Dealer agrees to use his best efforts to promote, sell and service Goods. The Dealer further agrees to achieve sales objectives and marketing penetration within Dealer's Area of Responsibility satisfactory to the Company." The Agreement provided that it could not be assigned without the written consent of John Deere and that the company could terminate the Agreement immediately if substantial change in ownership occurred without John Deere's prior written consent.

Additionally, the Agreement also incorporates by reference the John Deere Agricultural Dealer Conditions of Sale, copies of which were sent to Tri–State at various times over the course of its dealership ("Conditions of Sale"). Section 1 of the Conditions of Sale states in relevant part:

> The Company may refuse to sell or ship Goods and shall have no liability to the Dealer for delays in shipment or if it fails to sell, ship or deliver any Goods to the Dealer:
>
> (a) For any causes beyond the Company's control;
>
> (b) If the demand for Goods exceeds the available supply;
>
> (c) If the Dealer's appointment has expired without the execution of a new Authorized Agricultural Dealer Agreement or has been cancelled; or if the Company believes in good faith that:
>
> (d) The Dealer's financial condition does not justify the extension of additional credit;
>
> (e) The Dealer has consistently failed to perform his obligations under his Authorized Agricultural Dealer Agreement;
>
> (f) The Dealer's unsold inventory of such Goods would be excessive;

(g) Shipment would result in larger total dealer inventories of such Goods than the Company is willing to finance.

A John Deere dealer's performance is measured by the percentage of sales a dealer makes in its AOR as compared to the total industry sales made in that AOR. A dealership's AOR includes the geographical area for which the dealership is the closest John Deere dealer. In other words, for John Deere customers in Tri–State's AOR, Tri–State was the closest John Deere dealer. John Deere uses a percentage of sales yardstick rather than units sold or dollars earned in order to achieve uniformity. Thus, under John Deere's system, a dealer who achieves a 50% market share in a small AOR selling mostly small sized tractors is considered by John Deere to be just as successful as a dealer who achieves a 50% market share in a large AOR selling large tractors, even though the total number of units sold and dollars received may be significantly different.[2]

Using the dealer's performance as a baseline, John Deere then sets an individualized minimum market share goal for the dealer to meet. John Deere reserves the right to amend those minimum market share requirements. If a dealer performs below market, John Deere may increase the market share requirement until a dealer consistently performs at an acceptable level.

Each year John Deere identifies the dealers whose market share is five percentage points below the average for their respective division. Using a list sorted from high to low by market share, John Deere identifies the dealerships on the bottom of that list and places them in the low performing dealer program. John Deere put Tri–State into the low performing dealer program and sent the standard first-year notice letter in 2002 informing Tri–State that its performance for 2001 was below the Territory and Division levels. John Deere's March 26, 2002 letter set a minimum market share expectation of 33.3%. On January 7, 2003, John Deere sent a second-year warning letter to Tri–State indicating that it expected Tri–State to achieve a minimum market share of 36.3%. The letter noted that Tri–State's 2002 market share was 18.2%, which was short of Tri–State's expected market share of 33.3%. Each of these letters noted that failure to achieve these minimum market percentages could result in termination of Tri–State's appointment as a John Deere dealer. On January 15, 2004, John Deere sent a third and final notice letter in 2004 indicating that it expected Tri–State to achieve a minimum 39.3% market share. It noted that Tri–State had failed to meet John Deere's expectations for the previous year and had only posted a 23.1 % market share.

If a dealer fails to satisfy John Deere's requirements for two years, the dealer is considered for termination and is notified that it may be terminated if the market share goal is not achieved in the final year of the low performing dealer process. Because Tri–State failed to increase its market share, John Deere informed Tri–State on January 3, 2005 that it was being termi-

---

**2.** Although Tri–State disputes the facts relating to the process John Deere uses to measure dealer performance, such disputes are insufficient to create genuine issues of material facts. Tri–State does not dispute that the system indeed operates in this way. Rather, Tri–State denies that John Deere's calculation of market share is reasonable because it claims John Deere has the ability to skew the numbers depending on how it assigns or changes an area of responsibility. However, whether John Deere's method is reasonable is for the Court to decide and Tri–State cannot create issues of fact simply by denying or disputing the reasonableness of the system.

nated as a John Deere dealer. The letter noted that Tri–State had only achieved a market share of 14.9% for 2004 and fell short of John Deere's minimum expectations. In addition, the letter stated that Tri–State's performance was well below John Deere's expectations, the Territory average, and the Division average for 2002, 2003 and 2004.

Upon filing of this suit, Tri–State had claimed that John Deere did not always fulfill its existing customer orders and it did not supply enough equipment to display for potential customers. John Deere admits it did experience delays in providing several models of equipment, particularly the 5003 series tractor, due to high demand. The way John Deere handled this problem was to first fulfill customer sales contracts and then distribute unsold, showroom units to its dealers. Tri–State's corporate representative, Wally Phillips, testified that at Tri–State's request, John Deere shipped particular stock orders after John Deere notified Tri–State that it was being terminated:

> Q: So what happened in response to Mr. Wolfe's letter, Exhibit 36? Were some of those orders not cancelled?
>
> A: The ones for—the ones we told him about we told him not to cancel them.
>
> Q: And John Deere honored those orders?
>
> A: Yes, they did.

*See* Deposition of Tri–State Corporate Representative (Deborah Denny), Exhibit 2, at 253:14–16, Doc. No. 97–6. John Deere states it never cancelled Tri–State's customer order for a goods or parts sale. Tri–State's corporate representative further testified that no customer orders were cancelled after John Deere decided to terminate Plaintiff's dealership:

> Q: But there were no customer orders that were cancelled; is that correct?
>
> A: We didn't—let's see. No.

*See* Denny Depo. Exhibit 2, at 258:13–19, Doc. No. 97–6.

After termination of the dealership, Tri–State tried to find a buyer willing to purchase the dealership and/or its stock of merchandise. Tri–State received no offers in writing to sell the Dealership and/or its stock of merchandise. Tri–State had verbal discussions with two potential buyers: DeWayne Craig and John Lykins. Tri–State claims these discussions were never reduced to writing because John Deere refused to approve any of the potential buyers who were willing and able to purchase the dealership. Judy Wolfe testified that no documentation was ever received by Tri–State regarding any of the Buyers' interest in purchasing the Dealership:

> Q. Did any of these individuals who expressed an interest ever give you a letter of intent or some documentation expressing their interest?
>
> A. No. It never got that far. And we didn't ask for one.

*See* Judy Wolfe Deposition, Exhibit 4, at 60:21–61:1, Doc. No. 73–11. Tri–State did not provide John Deere with documentation relating to any of the potential buyers of the dealership:

> Q. Other than, it sounds like, telephone conversations providing the name of an individual who expressed interest in buying the dealership, did Tri–State provide any other information about these buyers to John Deere?
>
> A. Just, you know, Ben would ask questions, and Charles would answer them concerning, you know, are they financially stable or something like that. Are they somebody that you think could financially handle and-
>
> Q. But Tri–State didn't provide any documentation about the potential buyer or any records or anything like that?
>
> A. No.

*See* D. Denny Deposition, Exhibit 2, at 236:25–237:14, Doc. No. 97–6.

John Deere met with potential buyer DeWayne Craig ("Craig") about purchasing the Dealership. Craig was interested in the purchase only by financing nearly 100% of the value of the dealership. John Deere informed Craig that low equity dealerships often fail, so John Deere required 25% equity for new dealers. Craig indicated to John Deere that he could not meet this requirement. Since John Deere did not approve any of Tri–State's potential buyers, John Deere approved Darren and Debbie Murphy, John Deere employees, to take over the dealership.

John Deere now seeks summary judgment on all of Tri–State's claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The facts and inferences are viewed in the light most favorable to the nonmoving party. *Fed.R.Civ.P. 56(c)*; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–590, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. *Matsushita,* 475 U.S. at 586–90, 106 S.Ct. 1348.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists. *Fed.R.Civ.P. 56(e)*; *Lower Brule Sioux Tribe v. South Dakota,* 104 F.3d 1017, 1021 (8th Cir.1997). To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved. *Lower Brule,* 104 F.3d at 1021. Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment. *Id.* Rather, "the disputes must be outcome determinative under prevailing law." *Id.* (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts." *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348. Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548.

## III. DISCUSSION

Defendant John Deere seeks summary judgment on all of Tri–State's claims. John Deere sets forth three arguments: (1) Tri–State fails on Count I for wrongful termination because Tri–State has no evidence that John Deere did not have good cause to terminate Tri–State's dealership under Mo.Rev.Stat. § 407.840; (2) Tri–State fails on Count II for breach of contract because John Deere fulfilled its obligations under the agreement, which anticipates and expressly excuses delays or cancellations caused by, among other things, demand exceeding supply; and (3) Tri–State fails on Count III for interference with a business expectancy because Tri–State has no evidence indicating that it had a valid business expectancy in the form of a bona fide buyer for the dealership, or that John Deere acted without

justification in response to Tri–State's unsuccessful attempts to find a buyer for the dealership.

## COUNT I: WRONGFUL TERMINATION

### A. Whether John Deere's Termination of Tri–State was for Good Cause

John Deere argues that it terminated Tri–State's dealership for good cause, specifically for its failure to achieve the minimum required market share as required by the Agreement and its decline of market share in its AOR. Under Mo.Rev.Stat. § 407.840, a manufacturer may terminate a farm equipment dealership for good cause:

> Good cause means failure by a farm equipment dealer to substantially comply with essential and reasonable requirements imposed upon the dealer by the dealership agreement if such requirements are not different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement.

In addition, good cause shall exist whenever:

> (8) The farm equipment dealer has consistently failed to meet the manufacturer's requirements for reasonable market penetration based on the manufacturer's experience in other comparable marketing areas.

*Id.* § 407.840(8)

John Deere argues that good cause existed for termination of Tri–State's dealership because Tri–State was not meeting its dealer market share goals and its goals are considered to be essential and reasonable under the Missouri Farm Implement Dealer Act. John Deere states that Tri–State had an obligation to achieve a certain market share in its AOR under the agreement. In support of its assertion, John Deere refers to the agreement, which states in § 1(d) that the dealer further agrees to achieve sales objectives and market pen-

etration within Dealer's AOR satisfactory to the Company. The Court will discuss below whether John Deere's market share requirements were essential and reasonable under § 407.840, whether the market share requirements were imposed on other similarly situated dealers, and thus, ultimately, whether John Deere had good cause to terminate Tri–State's dealership.

### 1. Whether John Deere's Low Performing Dealer Market Share Goals are Essential and Reasonable

■ John Deere relies on two cases in arguing that its market share requirements were essential and reasonable. First, John Deere refers the Court to *J.I. Case Co. v. Early's, Inc.*, 721 F.Supp. 1082 (E.D.Mo.1989), where the dealer was terminated for failing to comply with a requirement to install a computer which could communicate directly with the manufacturer. The Court determined that the computer system was an "essential requirement" because it was "essential for efficient and effective communication between dealers and the manufacturer and between the dealers themselves." *Id.* at 1085. The Court held that "failure to comply with a uniformly applied and reasonable computer installation requirement constituted good cause for dealership termination" under the Missouri Farm Implement Dealer Act. *Id.* However, *JI Case* primarily focused on whether the computer inventory requirement was essential. The parties in this case do not dispute that the market share requirement was essential. Thus, the only issue is whether the market share requirements imposed on Tri–State were reasonable.

Second, defendant referred the Court to *Budach Implement, Inc. v. CNH America LLC,* 2007 WL 2310066, 2007 U.S. Dist. LEXIS 57667 (D.Minn. Aug.7, 2007), where the Court determined under the

Minnesota Farm Equipment Dealership Act, good cause existed for the termination of plaintiff dealer.[3] In *Budach,* CNH, an agricultural manufacturer, had terminated the dealer, Budach Implement, because it failed to maintain required inventory levels that were triggered when the dealer failed to capture 90% of CNH's state-market share in the dealer's territory for each market share-measured unit. *Id.* at *3–6, 2007 U.S. Dist. LEXIS 57667 at *6–10. The district court granted summary judgment in favor of the manufacturer. *Id.* *8, 2007 U.S. Dist. LEXIS 57667 at *29. The court found that the formula CNH used to set the inventory requirement was fair because it was based "not merely on CNH's state-wide market penetration, but on the historical sales figures in the dealer's own territory." *Id.* at *5, 2007 U.S. Dist. LEXIS 57667 at *19. The district court found that the requirement was "actually quite generous" because it required the dealer to carry an inventory only half the size of what would normally be expected. *Id.* at *6, 2007 U.S. Dist. LEXIS 57667 at *21. The dealer had complained that the requirement was unreasonable because it did not have the capital to satisfy the inventory requirement. The district court stated "[the dealer simply did not have the financial wherewithal to maintain appropriate inventory, which in turn, made it difficult for [the dealer] to sell the manufacturer's] products." *Id.* at *6, 2007 U.S. Dist. LEXIS 57667 at *25. But the district court held that the Minnesota Farm Equipment Dealership Act, "does not invalidate otherwise essential and reasonable terms of a dealership agreement on the basis that a particular dealer cannot meet them." *Id.* The Court went on to state "[i]f that were the case, the [Act] would never allow the termination of a dealer." *Id.*

John Deere argues this case is the same *Budach* because John Deere measures market share goals in the same manner for John Deere dealerships nationwide. John Deere states that dealer performance is measured by the percentage of sales by a dealer in its AOR as compared to the total industry sales in that AOR. John Deere's position is that using a percentage of sales rather than using units sold or dollars earned provides a uniform management system that is tailored to the relative industry potential of a given dealer's AOR. Thus, John Deere notes that under its system, a dealer who achieves a 50% market share in a small AOR selling mostly small sized tractors is considered by John Deere to be just as successful as a dealer who achieves a 50% market share in a large AOR selling large tractors even though the total number of units sold and dollars received may be significantly different.

Additionally, John Deere states that it notified Tri–State in 2002, 2003, and 2004 that it needed to meet its market share goals. John Deere states that all of these market share goals from 2002–2004 were more than seven percentage points below the territory average (the average market share of John Deere dealers in plaintiff's area) and 25 percentage points below the average for the division.

Tri–State responds that whether good cause exists is an issue for the jury to decide. Tri–State asserts that the evidence suggests that market share numbers may be manipulated at John Deere's whim just by changing a dealer's AOR or the percent of responsibility within the counties. Tri–State provides as an example the fact that John Deere decided not to include

---

**3.** Although *Budach* involved the application of the Minnesota Farm Equipment Dealership Act, Minnesota's Act contains identical provisions to the Missouri Farm Implement Dealer Act.

Oklahoma in Tri–State's AOR even though Tri–State bordered Oklahoma.

The Court finds that John Deere's market share requirements imposed on Tri–State were essential and reasonable under § 407.840. Tri–State has not provided sufficient evidence to demonstrate otherwise. Tri–State cannot simply dispute the reasonableness of the system by pointing out other ways John Deere could have calculated dealer market performance. Although John Deere could have included bordering Oklahoma in Tri–State's AOR, John Deere's failure to do so is not unreasonable. First, the Court concludes that John Deere's requirements work for both large and small dealerships. By way of example, if Tri–Sate's total agricultural equipment sales were $500,000 (as opposed to $100,000 using Tri–State's 2002 market share goals of 33.3%), out of a total of $500,000 in agricultural equipment sales, the dealership would have to make $166,500 in sales to meet its target. In the case of $100,000 total sales, however, the dealership would have to sell only $33,300 in agricultural equipment to meet its target. In both cases, the 33.3% market share goal adjusts the dollar volume required to the size of the market. Thus, by using a percentage measure rather than units sold, John Deere scales its performance targets to accommodate differences in the size of a given dealership's market and fluctuations in that market.

Further, Tri–State cannot prove that its market share would have increased had Oklahoma been included in its AOR. Wally Phillips, the person who terminated Tri–State, even testified that at some point in 2003 or 2004, Oklahoma was added to Tri–State's AOR. *See* Wally Phillips Depo., Plaintiff's Exhibit 6, at 65:5–9, Doc. No. 97–7. However, TriState's market share for 2003 was 23.1 % and in 2004, it was 14.9%. Thus, if Oklahoma was included in plaintiff's AOR, no difference occurred in plaintiff's market share percentage.

In addition, Tri–State had notice of these market share requirements as early as 2000. Yet, there is no evidence that plaintiff ever questioned or complained about John Deere's method of calculating market performance prior to this suit. Thus, Tri–State cannot evade its responsibilities under the contract by now challenging John Deere's methods just because other ways exist to measure market performance. Tri–State was required under the agreement to maintain achieve sales objectives and market penetration within its AOR and Tri–State failed to do so. John Deere notified Tri–State at least three times that its market share was insufficient before it terminated Tri–State. The Court cannot invalidate otherwise essential and reasonable terms of the dealership agreement simply because Tri–State could not meet the requirements, *Budach,* 2007 WL 2310066 at *6, 2007 U.S. Dist. LEXIS 57667 at *25. Therefore, for the above reasons, the Court finds that John Deere's dealer market share requirements are reasonable.

*2. Whether Tri–State can Show Similarly Situated Dealers Were Treated Differently*

Section 407.840 states that the manufacturer's requirements "must not [be] different from those requirements imposed on other similarly situated dealers either by their terms or in the manner of their enforcement." Mo.Rev.Stat. § 407.840. John Deere argues that Tri–State has failed to show a difference in treatment. To establish that a dealer was similarly situated to it, the district court held that "[the dealer] needs to submit evidence that the dealer fell similarly short of the [manufacturer's] requirement and did so for a similar length of time, despite

a similar set of warnings." *Budach*, 2007 WL 2310066 at *7, 2007 U.S. Dist. LEXIS 57667 at *27–28. In *Budach*, the court held that it was plaintiff's burden to show a difference in treatment and they had failed to do so.

Tri–State responds that John Deere's determination of its AOR shows that Tri–State was not treated the same as other dealers. Tri–State states that according to John Deere's corporate designee, John Deere's procedure is to assign an AOR based on where the dealer sits geographically. John Deere then takes the middle distance between John Deere dealers and draws a polygon to determine a dealer's AOR. Sales from outside this assigned area do not count towards the dealer's market share. Tri–State argues that its AOR should therefore have consisted of the areas closest to the dealer regardless of state lines, which in Tri–State's case would be Oklahoma. As a result of John Deere not including Oklahoma in Tri–State's AOR, the sales that Tri–State made in Oklahoma were not counted in its market share.

Additionally, Tri–State states that in the deposition of John Deere's corporate designee, Wally Phillips, who made the decision to terminate Tri–State, was asked which dealerships were comparable to Tri–State. Phillips named Rogersville, Missouri, Joplin, Carthage, Lebanon, and Freistatt, Missouri. Tri–State disagrees that these are similarly situated dealers as most of these dealers are located in cities with population sizes above 5,000 residents. Therefore, Tri–State denies that John Deere complied with § 407.840 because John Deere did not compare Tri–State with similarly situated dealers.

The Court finds that Tri–State has failed to meet its burden in showing that similarly situated dealers were treated differently. Tri–State only argued that John Deere should have compared it to dealer-

ships which were similar in population size. However, Tri–State failed to provide any evidence that dealerships, large or small, in its AOR were treated differently than Tri–State. Tri–State did not show that another small dealership consistently failed to meet its market share percentage goals and that John Deere failed to terminate that dealership. Also, Tri–State provided no evidence that the market share requirements were imposed differently on other dealers. In fact, the record reflects that John Deere uniformly applied the same market share requirements on all dealers within Tri–State's AOR. No dealer was exempt from meeting its market share requirements. While the actual percentage that each dealer had to meet was different, that percentage is based on the dealer's performance. That same process was applied to all dealers. Thus, without evidence that a single similarly situated dealer was treated differently, Tri–State's wrongful termination claim cannot survive summary judgment.

Because John Deere's market share requirements were essential, reasonable, and uniformly applied to all the dealers in Tri–State's AOR, the Court hereby finds that good cause existed for termination of Tri–State's dealership. The fact is that Tri–State failed to meet its dealer market share requirements from 2001–2004. Tri–State cannot dispute that fact by attempting to change the way in which John Deere calculates its market share performance. Tri–State's minimum market share targets were at least seven percentage points below the territory averages in Tri–State's territory for the years 2001–2004 and TriState's actual market share was over 20% less than the territory average in those years. In 2002, Tri–State's market share was 18.2% and its market share goal was 33.3%. In 2003, while Tri–State's market share slightly increased to 23.1 %, Tri–State still fell below its goal of 36.3%.

Again, in 2004, Tri–State's market share was 14.9% with a market share goal of 39.3%. In fact, in 2004, Tri–State was the lowest performing dealer within its territory.

Tri–State strongly disagrees that it was a low performing dealer in its AOR. Tri–State states that on its tax returns it reported an increase in sales from $1,632,583 in 2003 to $2,043,270 in 2004. Tri–State also argues there is sufficient evidence to raise a genuine issue of material fact as to whether John Deere's failure to supply products prevented Tri–State from increasing its sales. Further, Tri–State states that John Deere's designee testified that in 2000, Fort Scott, Kansas and Nixa, Missouri were lower performing than Tri–State. In 2002, Tri–State notes states that Chanute, Kansas was lower performing than Tri–State. In 2003, Tri–State points to Lockwood, Joplin, and Nixa as performing lower than Tri–State. In 2004, the year Tri–State received the termination notice, Tri–State asserts that Lockwood, St. James, Freistatt, Carthage, and Alton all performed worse than Tri–State.

The Court concludes that Tri–State's arguments fail on this point. Tri–State's argument relies on the use of settlements. Settlements include sales of everything from tractors, tire repairs, bolts, toy tractors, and it includes sales regardless of whether they are within Tri–State's AOR. First, according to Wally Phillips' deposition, most of the dealerships that Tri–State pointed to were lower in settlements than Tri–State, but these dealerships were not lower in market share. Also, the dealerships in Chanute, Kansas and Fort Scott, Kansas elected to close on their own. Thus, it is obvious that their market share percentages would be down.

Second, settlements are not the measure used to gauge performance under John Deere's system. While Tri–State may have increased its sales from $1,632,583 in

2003 to $2,043,270 in 2004, these sales included settlements. Under John Deere's system, a dealer who captures a sufficient market share percentage of the customers in its own AOR can meet John Deere's requirements even though its overall settlements are lower than those of another dealership. Since the Court found that John Deere's system is reasonable, the Court cannot conclude that Tri–State was performing well in its market and meeting its goals based on its improper use of settlements. Tri–State is again attempting to change a reasonable system in order to avoid its obligations under the dealership agreement.

The Court finds that Tri–State consistently failed to meet an essential and reasonable term of the dealership agreement which constituted good cause for John Deere's termination of Tri–State's dealership. Therefore, John Deere's motion for summary judgment is **GRANTED** with respect to Count I of Tri–State's wrongful termination claim under the Missouri Farm Implement Dealer Act.

**COUNT II: BREACH OF CONTRACT**

**B. Whether John Deere Fulfilled its Obligations under the Agreement by Supplying Tri–State with Equipment.**

■ Tri–State claims that John Deere breached the Agreement by failing to timely supply it with merchandise, delivering inventory after the growing season had ended, and by canceling orders placed by Tri–State. John Deere argues that Tri–State has no evidence that it ever delayed or canceled orders in violation of the agreement. Section 1 of the Agreement states:

> The Company agrees to accept orders placed by the Dealer for Goods which the Company contemplates will be shipped during the period of appointment, subject to the Company's Condi-

tions of Sale. Even though an order has been accepted, the Company has the right to refuse to ship Goods and shall have no liability to the Dealer for such refusal or for any delay or other failure to ship or deliver Goods as provided in the Conditions of Sale or Section 4 hereof.

Additionally, Section 1 of the Conditions of Sale, "Conditions Affecting Delivery," provides the following: The Company may refuse to sell or ship Goods and shall have no liability to the Dealer for delays in shipment or if it fails to sell, ship, or deliver any Goods to the Dealer:

(a) For any causes beyond the Company's control;

(b) If the demand for Goods exceeds the available supply;

(c) If the Dealer's appointment has expired without the execution of a new authorized agricultural dealer agreement or has been cancelled; or if the Company believes in good faith that:

(d) The Dealer's financial condition does not justify the extension of additional credit;

(e) The Dealer has consistently failed to perform his obligations under his authorized agricultural dealer agreement;

(f) The dealer's unsold inventory of such Goods would be excessive;

(g) Shipments would result in larger total dealer inventories of such Goods than the Company is willing to finance.

Tri–State responds that John Deere wishes this Court to believe that it has the right to terminate a dealer when the dealer fails to increase its sales, but that John Deere is not required to provide products. Tri–State claims that John Deere failed to fulfill existing customer orders and with sufficient products to display in its showroom for potential customers. Tri–State asserts that potential customers wanted to view the products and that it was unable to show the products to its customers. Tri–State also argues that John Deere is attempting to escape liability by relying on the terms of the contract, but plaintiff argues that John Deere's contract is unconscionable and against public policy because it attempts to take away the protections and responsibilities of the Missouri statute.

The Court finds that Tri–State has presented no evidence that John Deere violated the agreement by failing to provide products. Although Tri–State claims that John Deere failed to fulfill existing customer orders, plaintiff provided no evidence to the Court of particular orders that were not fulfilled. The Court cannot simply rely on plaintiff's mere assertion that John Deere did not fulfill existing customer orders. In addition, it was John Deere's policy to fulfill existing customer orders first and any remaining equipment available for showroom display was distributed to dealers most likely to sell product based upon past history. The Court agrees with John Deere that the parties' contract expressly permits for this distribution system. If John Deere did not send plaintiff enough products for showroom display, then John Deere was entitled to do so based on the fact that Tri–States' market share was not high. Section 1 of the Condition of Sales clearly lists the many reasons for which John Deere is not responsible for the failure to deliver or supply equipment. There is no evidence that John Deere did not follow this provision.

Further, the Court rejects Tri–State's argument that the contract is unconscionable. Tri–State has not even shown what protections and responsibilities John Deere has taken away under the dealership agreement or which Missouri statute the agreement violates. There are two types of unconscionability: (1) procedural unconscionability and (2) substantive

unconscionability. Neither is present here. "Procedural unconscionability deals with the formalities of making the contract, while substantive unconscionability deals with the terms of the contract itself." *See State ex rel. Vincent v. Schneider*, 194 S.W.3d 853, 858 (Mo.2006)(citing *Bracey v. Monsanto Co., Inc.*, 823 S.W.2d 946, 950 (Mo. banc 1992)). "Procedural unconscionability focuses on such things as high pressure sales tactics, unreadable fine print, or misrepresentation among other unfair issues in the contract formation process." *Id.* (citing *Whitney v. Alltel Communications, Inc.*, 173 S.W.3d 300, 308 (Mo.App. 2005)). However, "substantive unconscionability means an undue harshness in the contract terms." *Id.* The Court finds no evidence of either form of unconscionability. There is no evidence that John Deere engaged in high pressure sales tactics or that the contract contained unreadable fine print. Finally, no undue harshness is presented by Section 1 of the Condition of Sales or in any of the contract terms. The Court will not rewrite the parties' contract simply because Tri–State is not pleased with the result. Thus, plaintiff's unconscionability argument fails.

Because there is no evidence that John Deere violated the agreement and plaintiff provided no evidence that John Deere failed to fulfill existing customer orders, plaintiff's breach of contract claim fails. Accordingly, for the reasons described above, the Court hereby **GRANTS** summary judgment in favor of John Deere on Count II of Tri–State's breach of contract claim.

**Count III. TORTIOUS INTERFERENCE WITH BUSINESS EXPECTANCY**

**C. Whether John Deere Tortiously Interfered with Tri–State's Business Expectancy**

Count III alleges that John Deere tortiously interfered with Tri–State's efforts to sell the dealership to a new owner. In order to recover for tortious interference with a business expectancy under Missouri law, plaintiff must prove the following:

(1) a contract or a valid business expectancy;

(2) defendant's knowledge of the contract or relationship;

(3) intentional interference by the defendant inducing or causing a breach of the contract or relationship;

(4) absence of justification; and

(5) damages resulting from defendant's conduct.

*Massey v. Tandy Corp.*, 987 F.2d 1307, 1310 (8th Cir.1993). In order for a valid business expectancy to exist, plaintiff must show more than "a mere hope of establishing a business relationship which was tenuous." *Wash Solutions, Inc. v. PDQ Mfg.*, 395 F.3d 888, 898–96 (8th Cir.2005) (quoting *Serv. Vending Co. v. Wal–Mart Stores*, 93 S.W.3d 764, 769 (Mo.Ct.App.2002)). Further, "[i]n order to have a claim for interference with a valid business expectancy, it is necessary to determine if the expectancy claimed was reasonable and valid under the circumstances alleged. If it is not, there was nothing for defendants to have interfered with." *Id.* at 896.

First, John Deere argues that Tri–State had no valid business expectancy. Tri–State claims that John Deere refused to approve any of the buyers for the dealership proposed by plaintiff. John Deere states, however, that Tri–State never made a formal offer to sell the dealership. Without making a formal offer to sell the dealership, John Deere claims that Tri–State had no valid business expectancy in the sale of the dealership.

Second, John Deere contends that even if Tri–State presented potential buyers to John Deere, John Deere had a contractual

right to approve of any potential buyer under the agreement. The agreement provided that the dealership could not be assigned without the written consent of John Deere and John Deere could terminate the agreement immediately if a substantial change in ownership occurred without John Deere's prior written consent. John Deere cites to *Hunt Enterprises, Inc. v. John Deere Industrial Equipment Co.*, 18 F.Supp.2d 697 (W.D.Ky.1997), where the Court held that because John Deere had a right to withhold its consent for the sale of Hunt's dealership under the contract, John Deere was entitled to withhold its consent even to the detriment of Hunt and Hunt's claim failed for improper interference by John Deere. Thus, John Deere argues that it had a right to withhold consent under the agreement when Tri–State brought a potential buyer to John Deere. Also, John Deere asserts that plaintiff cannot prove the fourth element, absence of justification, because John Deere had the legal right to approve or disapprove of a potential buyer.

Tri–State responds that John Deere tortiously interfered with Tri–State's potential buyers. Tri–State claims it had two potential buyers: (1) Dwayne Craig and (2) John Lykins. Tri–State claims that Craig had enough equity to purchase the dealership, but that John Deere was unwilling to approve the dealership. Tri–State states that Lykins also had sufficient funds to purchase the dealership, but that John Deere refused to allow Lykins to keep the dealership in South West City, Missouri. When Lykins offered to open the dealership in Gravette, Arkansas, Tri–State alleges John Deere refused to consider this option. Further, Tri–State contends it did not seek formal written agreements from these potential buyers because it was first necessary to obtain John Deere's approval. Also, Tri–State notes that after Deere rejected these interested buyers, John Deere then approved Darren

and Debbie Murphy, both John Deere employees, to take over as the dealership in McDonald County. Thus, Tri–State argues that a jury should determine whether John Deere tortiously interfered with Tri–State's ability to sell its dealership.

The Court finds that Tri–State has failed to show the existence of a valid business expectancy. Thus, Tri–State's tortious interference claims fails as a matter of law. The Court does not consider oral discussions sufficient to confer a valid business expectancy when none of these discussions materialized into formal offers. In fact, Judy Wolfe, testified that no documentation was ever received by Tri–State regarding any of the Buyers' interest in purchasing the Dealership:

Q. Did any of these individuals who expressed an interest ever give you a letter of intent or some documentation expressing their interest?

A. No. It never got that far. And we didn't ask for one.

*See* Judy Wolfe Deposition, Exhibit 4, at 60:21–61:1, Doc. No. 73–11. Tri–State did not provide John Deere with documentation relating to any of the potential buyers of the dealership. *See* D. Denny Deposition, Exhibit 2, at 236:25–237:14, Doc. No. 97–6.

■ Moreover, the dealership agreement expressly provides that the dealer cannot assign the agreement or change the ownership of the dealership without John Deere's consent. Thus, John Deere was within its contractual rights to refuse to authorize the transfer of the dealership agreement to potential purchasers who lacked funds and a suitable location. If some of the potential buyers did not satisfy John Deere's buyer requirements, then Tri–State cannot claim it had a valid business expectancy. Even if Tri–State had a valid written offer from a buyer to purchase the dealership, John Deere still

would have the right to withhold its consent under the agreement. Also, it is mere speculation that these buyers would have gone through with purchasing the dealership. "Liability under a tortious interference theory cannot be predicated upon speculation, conjecture, or guesswork, and no fact essential to submissibility can be inferred absent a substantial evidentiary basis." *Mueller v. Abdnor,* 972 F.2d 931, 938 (8th Cir.1992)(citing *A.L. Huber & Son, Inc. v. Jim Robertson Plumbing, Inc.,* 760 S.W.2d 496, 499 (Mo. Ct.App.1988)).

Because there is insufficient evidence in the record to show that Tri–State had a valid business expectancy in its potential buyers, the Court hereby **GRANTS** summary judgment in favor of John Deere on Count III of Tri–State's tortious interference with business expectancy claim.

## IV. CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment (Doc. No. 71) is **GRANTED** on all of plaintiff's claims. Therefore, the remaining pending motions in this case are hereby **DENIED AS MOOT:** Plaintiff's Motion in Limine (Doc. No. 112) and Defendant's motion in limine (Doc. No. 114).

**IT IS SO ORDERED.**